2000-NMSC-002

994 P.2d 728

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Timothy C. ALLEN, Defendant–Appellant.**

**No. 23,493.**

Supreme Court of New Mexico.

Dec. 1, 1999.

Rehearing Denied Jan. 6, 2000.

Phyllis H. Subin, Chief Public Defender, Will O'Connell, Assistant Appellate Defender, Santa Fe, for Appellant.

Patricia A. Madrid, Attorney General, M. Victoria Wilson, Assistant Attorney General, Santa Fe, for Appellee.

## OPINION

MINZNER, Chief Justice.

{1} Defendant appeals his death sentence pursuant to the Capital Felony Sentencing Act (CFSA), NMSA 1978, §§ 31–20A–1 to –6 (1979, as amended through 1991). He also appeals his convictions of first degree murder in violation of NMSA 1978, § 30–2–1(A)(1) (1994), first degree kidnapping in violation of NMSA 1978, § 30–4–1 (1973, prior

to 1995 amendment), and attempted criminal sexual penetration (CSP) in violation of NMSA 1978, § 30–28–1 (1963) and NMSA 1978, § 30–9–11(C) (1993, prior to 1995 amendment). On appeal, Defendant challenges his convictions and his death sentence on ten grounds: (1) prosecutorial misconduct; (2) insufficient evidence of aggravating circumstances; (3) errors in selecting the jury; (4) errors in refusing to submit lesser-included-offense instructions; (5) insufficient evidence to support the kidnapping conviction; (6) disproportionality of the death sentence in this case to the penalty imposed in other cases; (7) error in making the sentences for kidnapping and attempted CSP concurrent; (8) the unconstitutionality of the CFSA; (9) lack of an adequate record on appeal; and (10) cumulative error. We review Defendant's judgment of conviction and sentence of death pursuant to Section 31–20A–4(A). We affirm Defendant's convictions and his sentence. None of the statutory grounds for reversing a death sentence are present in this case, and Defendant's other claims are without merit.

## I.

{2} The victim of Defendant's crimes was seventeen years old.[1] She resided with her mother near Flora Vista, New Mexico. According to her mother's testimony, she called from home at about 12:40 p.m. on February 7, 1994; she stated that she was going into town to apply for jobs and would return later in the day to vacuum. Sometime between noon and 1:30 p.m. on that date, she was seen walking along a road toward a convenience store in Flora Vista that was slightly less than one mile from her mother's residence. Several witnesses testified that they saw her in Flora Vista that afternoon. According to these witnesses, she paid her mother's water bill at the office of the Flora Vista Water Users Association and applied for a job at a restaurant. When she did not return home

in the evening as she had said she would, her mother became concerned, called the police to report her daughter's absence and went looking for her daughter at the restaurant and the convenience store in Flora Vista.

{3} Six weeks later, on March 21, 1994, a shepherd found the victim's partially decomposed body beside a tree in a remote, hilly area approximately three-and-one-half miles north of Flora Vista. Investigators who observed the scene testified that a denim coat was draped over the lower part of the body when they arrived. The victim's mother testified that she had instructed her daughter to wear the denim coat on the day she disappeared. The coat belonged to the victim's mother. The coat contained blood stains that were consistent with the victim's blood.

{4} When investigators lifted the coat, they observed that the victim's shirt was pulled up over her bra, one of her lace-up boots had been removed, and her pants and underwear had been pulled off one of her legs. The remains of a sanitary napkin adhered to her underwear. The victim's mother testified that her daughter started her menstrual period on the day before she disappeared.

{5} A medical investigator who observed the crime scene and a forensic pathologist who performed the autopsy on the victim's body testified that the condition of the victim's clothing was consistent with a sexual assault. In addition, the forensic pathologist found evidence of bruising on the victim's legs that may have indicated a struggle during a sexual assault. Defendant's mother-in-law testified that she observed a scratch on his face and a bruise on his lip around the time that the victim disappeared. The forensic pathologist testified that the decomposition of the victim's body may have prevented the discovery of further evidence of a sexual assault or struggle with an assailant.

---

1. Although we recognize that some mention of the victim's name was unavoidable at trial, we do not refer to the victim by name in this opinion for two reasons. First, the constitution and laws of New Mexico require that we respect "the victim's dignity and privacy throughout the criminal justice process." N.M. Const. art. II, § 24(A)(1); *accord* NMSA 1978, § 31–26–4(A) (1995, prior to 1999 amendment). Second, we note that at the time of her death the victim was still a child within the meaning of the Children's Code, *see* NMSA 1978, § 32A–1–4(B) (1999), and state law affords a reasonable degree of confidentiality in abuse and neglect cases, *see* NMSA 1978, § 32A–4–33 (1993); *see also* NMSA 1978, § 32A–1–17(A) (1995, prior to 1999 amendment).

{6} Both the forensic pathologist and the medical investigator testified that the cause of death was ligature strangulation. They observed that a rope had been wrapped tightly around the victim's neck four times. The rope contained two knots: one after the third loop around the victim's neck, and another after the fourth loop. The victim's red hair had become tangled in the rope. The forensic pathologist concluded that the rope probably cut off the circulation of blood to the victim's brain, that it probably took between thirty seconds and one minute for the strangulation to cause the victim to lose consciousness, and that it probably took several minutes of strangulation to cause the victim's death. Based on the condition of the body at the time it was discovered, the medical investigator testified that the victim probably died on the same day that she disappeared, although he could not pinpoint an exact time of death.

{7} The medical investigator also testified that the condition of the crime scene suggested that the victim had been killed elsewhere before her body was placed in the location where it was discovered on March 21. There was a boot print in the soil beneath the victim's body. The State presented evidence to suggest that the killer left the boot print when he carried the victim's body to that location, and that the boot print was consistent with one of Defendant's boots.

{8} Investigators also linked Defendant to the rope that was used to strangle the victim. Several witnesses testified that the rope had a distinct design and came from the back of a white pickup that belonged to the grandfather of Defendant's wife at the time of the victim's disappearance. These witnesses testified that the rope was kept in the back of the pickup and was used to restrain a trash barrel when the pickup was hauling trash to the dump. Defendant was seen driving this white pickup around the time of the victim's disappearance. Several witnesses also observed that the Defendant had extensively cleaned the cab of the pickup after the victim disappeared.

{9} Several months later, the white pickup was sold to another individual, who testified that he found strands of red hair consistent with the victim's hair under a seat-belt strap on the day he purchased it. He threw the hairs away after looking at them because he did not know that they were evidence of a crime, and investigators found no additional hairs when they searched the pickup in January 1995. After investigators returned the pickup, however, the owner found more strands of red hair when he removed a broken handle that was used to roll the window down. Other witnesses testified that the window handle was not broken when Defendant first borrowed the pickup in January 1994.

{10} Defendant made several statements both before and after his arrest. On February 24, 1994, while meeting with an off-duty sheriff's deputy and the deputy's spouse on an unrelated matter, Defendant stated that he was waiting for a friend at the convenience store in Flora Vista on the date of the victim's disappearance, and that he had seen her walking and going into a couple of buildings at that time. At a later meeting, both the deputy and his spouse saw the victim's name written in red ink on a page of Defendant's daily planner that corresponded to the date of the victim's disappearance. The State presented the daily planner to the witnesses at trial, and both noted that the pages had been replaced and that the victim's name no longer appeared on the pages. Defendant also stated to other witnesses that he saw the victim in Flora Vista on the date of her disappearance.

{11} In March 1994, after the victim's body was found, Defendant had a conversation with his wife's stepfather, in which Defendant stated that he had seen the victim hitchhiking near a bar and restaurant in Flora Vista, that he had stopped to pick her up, and that he offered her a ride into Aztec "to do some applications there or something." Defendant then explained that the victim had become very angry and insisted on being let out at the convenience store in Flora Vista. Defendant stated that he bought her a soft drink and a candy bar to calm her down, and that the last time he saw her was at the convenience store. Defendant also told several other witnesses that he talked to the victim or gave her a ride on the date of her

disappearance. Defendant told one of these witnesses that he had talked about his marital problems with the victim, that the victim gave a sympathetic response, and that he may have asked her if she wanted to go have a beer. He admitted to another witness that he wanted to give the victim a ride because she had red hair and was young and good-looking. Nonverbal communications suggested to the witness that Defendant wanted to pick up a girl.

{12} One night during the summer of 1994, while Defendant and his wife were working with a carnival in another state, Defendant stated to his wife "that he was with a girl and . . . he had sex with her, and that after they had sex that she said that she was going to the cops, and so that, so that he killed her." Defendant's wife told her mother about the statement, and it was eventually reported to police. When investigators asked Defendant about the statement on December 27, 1994, he responded that he had lied to his wife. Around the same time period, Defendant told another witness that he had been kidding when he made the statement.

{13} Following his arrest on December 29, 1994, Defendant was detained in the San Juan County Detention Center. There he told two inmates that he killed the victim. On two separate occasions, Defendant told the first inmate: "I killed that girl." On the second occasion, Defendant admitted that he had confessed to his lawyer and remarked that: "I wish I wouldn't have took, taken that damn rope with me." Later, Defendant told a second inmate: "I'm going to tell you the truth. I'll tell you what happened to" the victim.

{14} Defendant then proceeded to give the following account of his crimes: He picked up the victim outside a bar in Flora Vista and took her up in the hills. According to Defendant, she was "making moves" on him, he was "making moves" on her, and after that "some stuff happened." He tied a rope around the victim. He tied her up because she was "cute" and he wanted to "make love" to her. Also, he "liked having control over people" and wanted to "get back" at his girlfriend because they had a fight. While the victim was tied up in Defendant's pickup

and he was starting to "make love" to her, she "just fell down" or "limped down." After the victim "limped down," Defendant got scared and tied the rope again. He noticed that the victim was dead and was going to take her somewhere else, but the road was too muddy. He picked her up, carried her off the side of the road, and threw her in a wash or a ditch.

{15} Defendant was tried before a jury in December 1995. In the initial phase of his trial, the jury found Defendant guilty of first degree murder, first degree kidnapping, and attempted CSP. The trial court then sentenced Defendant to forty-two years imprisonment for kidnapping and attempted CSP after taking into account his prior convictions. In the second phase of the trial, the jury found two aggravating circumstances, murder in the commission of a kidnapping and murder of a witness to a crime to prevent report of the crime; the jury specified the death penalty, and the Court imposed sentence pursuant to the jury's verdict. This direct appeal followed.

## II.

{16} Under the first issue, prosecutorial misconduct, Defendant has raised issues of evidentiary error as well as improper argument. Defendant contends that prosecutorial misconduct was "pervasive and thematic, appealing to the juror[s'] fears and sympathy" and that it "violated [Defendant]'s constitutional rights to be free of cruel and unusual punishment, to an impartial jury, and to due process of law." We address these issues under three headings: claims of evidentiary error, other claims of prosecutorial misconduct, and cumulative error. We first address the claims of evidentiary error. The other claims of prosecutorial misconduct and cumulative error are addressed subsequently under **VII**.

{17} Defendant asserts that the trial court erred in admitting evidence of his statement to his wife, his invocation of his right to remain silent, his conversation with his attorney about his trial strategy, the risk to inmate witnesses who testified against him, a comparison of his case to other cases,

prior bad acts, testimony by an expert who had reviewed his mental health records, and victim impact. In general, we review the trial court's evidentiary rulings for an abuse of discretion, *see State v. Woodward,* 121 N.M. 1, 4, 908 P.2d 231, 234 (1995), when they are properly preserved for appellate review. *See State v. Lopez,* 105 N.M. 538, 544, 734 P.2d 778, 784 (Ct.App.1986). When an evidentiary issue is not properly preserved, our review is generally limited to questions of plain or fundamental error. *See State v. Lucero,* 116 N.M. 450, 453, 863 P.2d 1071, 1074 (1993). For the reasons stated below, we conclude that none of the evidentiary rulings that Defendant challenges on appeal provide a basis for this Court to reverse his convictions or his death sentence.

### A. *Defendant's Statement to his Wife*

{18} Defendant's wife disclosed to police and later testified at trial that Defendant told her he had raped and killed a girl, and that Defendant said he killed the girl because she threatened to report the rape to the police. According to his wife, Defendant probably made this statement one night in the summer of 1994. Investigators learned of the statement when they questioned Defendant's wife later that year. They incorporated the statement into affidavits that they used to show probable cause to obtain a warrant for Defendant's arrest and for a search of his vehicle.

{19} In December 1994, investigators interviewed Defendant and questioned him about the statement at issue. Before the interview, they read Defendant his rights under *Miranda v. Arizona,* 384 U.S. 436, 470, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), but did not inform him that the statement he made to his wife was privileged. In response to their questions, Defendant admitted that he had made the statement to his wife, but he claimed that the statement was a lie.

{20} Shortly after the interview, investigators executed the search warrant and gave Defendant a copy of the affidavit containing the statement at issue. Defendant showed the affidavit to a co-worker and acknowledged to the co-worker that he had made a statement similar to the one contained in the affidavit. Later, he discussed the statement again with a jail inmate.

{21} Defendant objected to the admission of the statement at trial and asserts on appeal that the trial court erred in admitting his statement to his wife because it is a confidential communication that is subject to the husband-wife privilege under Rule 11–505 NMRA 1999. The State concedes that the statement falls under the privilege contained in Rule 11–505 but contends that Defendant waived this privilege prior to trial by disclosing the statement to third parties. In response to this contention, Defendant asserts that the investigative tactics used by the State to elicit his waiver of the husband-wife privilege were so improper that they rendered any waiver invalid.

■ {22} In light of the State's concession, we agree with Defendant's initial assertion that his wife's statement was subject to the husband-wife privilege, and that Defendant was in a position to claim the privilege notwithstanding his wife's initial disclosure of the statement to police. Rule 11–505(B) gives a person "a privilege in any proceeding ... to prevent another from disclosing a confidential communication by the person to that person's spouse while they were husband and wife." Under Rule 11–512 NMRA 1999, "[e]vidence of a statement or other disclosure of privileged matter is not admissible against the holder of the privilege if the disclosure was A. compelled erroneously or B. made without opportunity to claim the privilege." Thus, the fact that Defendant's statement was disclosed to police and included in a search warrant does not necessarily render the statements admissible, because the disclosure occurred before Defendant had the opportunity to claim the privilege. *See State v. Compton,* 104 N.M. 683, 687, 726 P.2d 837, 841 (1986).

■ {23} Defendant contends that the husband-wife privilege under Rule 11–505 applies to statements that are introduced in the courts of the State of New Mexico to support an application for a warrant. We acknowledge that in New Mexico "[t]he rules with respect to privileges apply at all stages of all actions, cases and proceedings." Rule

11–1101(C) NMRA 1999; *cf. State v. Hart,* 391 N.W.2d 677, 679 n. 1 (S.D.1986) (interpreting a similar rule to mean that the husband-wife privilege applies to search warrant affidavits); *but cf. People v. Morgan,* 207 Cal.App.3d 1384, 255 Cal.Rptr. 680, 682 (1989) (reaching the opposite conclusion). However, we need not reach this issue. Defendant does not challenge the validity of the search warrant or the arrest warrant, and in any case, the erroneous admission of a privileged statement within a search warrant does not require reversal if the remaining, nonprivileged information in the affidavit is sufficient to establish probable cause. *See, e.g., Hart,* 391 N.W.2d at 679.

■ {24} Moreover, and most importantly, we determine that after Defendant was given the opportunity to claim the husband-wife privilege, he waived that privilege by disclosing the statement at issue to third parties. *See* Rule 11–511 NMRA 1999; 25 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5602, at 828 (1989). This waiver was not rendered invalid by the prior use of the statement in the search warrant affidavit. Regardless of whether communications protected by Rules 11–505 and 11–512 are admissible in warrant-application proceedings, law enforcement officers are not prohibited from using information that is voluntarily provided by a suspect's spouse for investigative purposes outside the courtroom. *See United States v. Harper,* 450 F.2d 1032, 1045–46 (5th Cir.1971); *State v. Kunkel,* 137 Wis.2d 172, 404 N.W.2d 69, 78–79 (Wis.Ct. App.1987). In this case, we see no reason to hold that investigators were precluded from questioning Defendant outside the courtroom about the statement they obtained from his wife, provided that the investigators complied with *Miranda,* 384 U.S. at 470, 86 S.Ct. 1602. The privilege stated in Rule 11–505 is not an exclusionary rule used to protect a fundamental right guaranteed by the United States Constitution, *see Lefkowitz,* 618 F.2d at 1319; *Muetze,* 243 N.W.2d at 397, and Defendant has not preserved the question whether the husband-wife privilege involves a fundamental right under our state constitution, *see State v. Gomez,* 1997–NMSC–006, ¶ 23, 122 N.M.

777, 932 P.2d 1. Under these circumstances, we cannot conclude that the disclosure in this case was "compelled erroneously" under Rule 11–512(A). The record reveals no basis for holding that Defendant's waiver of the husband-wife privilege was tainted by a violation of his constitutional rights or that Defendant was coerced into waiving the privilege by the inclusion of the statement at issue in the affidavits supporting the search warrant or the arrest warrant. Therefore, we conclude that the district court did not err in admitting the statement Defendant made to his wife.

**B.** *Defendant's Silence*

■ {25} Defendant's next contention is that the prosecutor violated his right to due process by eliciting testimony that Defendant had invoked his right to remain silent after being advised of this right in accordance with *Miranda,* 384 U.S. at 470, 86 S.Ct. 1602. Detectives Christensen and Schofield of the San Juan County Sheriff's Department arrested Defendant and advised him of his *Miranda* rights on December 29, 1994. They then drove Defendant from Albuquerque to a sheriff's office in Aztec, New Mexico. During the drive from Albuquerque to Aztec, Defendant made several statements. He told the detectives that he would have "shot it out" with them if they had attempted to arrest him the day before, but that he had changed his mind after talking with his employer. Referring to information contained in the affidavit for the search warrant that the detectives had served on him prior to his arrest, Defendant said a witness was incorrect in stating that the victim's name appeared in Defendant's daily planner. When they arrived at the sheriff's office in Aztec, Defendant told the detectives that he did not kill the victim and that he believed they did not have any evidence against him. He named another individual as the murderer. At some point during the interview, Defendant stated that he had some knowledge of the victim but that anything he said would implicate him.

{26} At trial, the prosecutor questioned Detective Christensen about this statement as follows:

Q: [W]hat, if anything, did the Defendant say to you in the interview room at the sheriff's office?

A: He said that he, basically, had some knowledge of the [victim], but anything that he said would implicate him, and, uh, stopped there.

Q: Okay. And when he said that he had some knowledge of [the victim], did he say with respect to what about [the victim]? I mean—

A: No, he did not go into detail.

Q: Did he say that he knew how [the victim] lived or not lived or—

A: Well, anything that he said would implicate him in the—in the death of [the victim].

Q: And did you—after—did he elaborate on, at all, what he knew that would implicate him on the death of [the victim]?

A: No, he did not.

Defendant did not object to this testimony until after Detective Christensen was excused as a witness and the jury was excused from the courtroom.

■■■■■ {27} Notwithstanding the lack of a timely objection at trial, an appellate court will apply the doctrine of fundamental error and grant review of certain categories of prosecutorial misconduct that compromise a defendant's right to a fair trial. *See State v. Rojo,* 1999–NMSC–001, ¶ 55, 126 N.M. 438, 971 P.2d 829. "Remarks by a prosecutor that directly comment on a defendant's invocation of the right to remain silent after receiving warnings under *Miranda* ... fall into this category of error." *Rojo,* 1999–NMSC–001, ¶ 55, 126 N.M. 438, 971 P.2d 829. The same rule applies to certain "prosecutorial questions pertaining to the defendant's postarrest silence" and certain testimony elicited by those questions. *State v. Hennessy,* 114 N.M. 283, 285, 837 P.2d 1366, 1368 (Ct.App.1992), *overruled in part on other grounds by Lucero,* 116 N.M. at 453–54, 863 P.2d at 1074–75. We apply this rule inasmuch as it is fundamentally unfair and a violation of due process to allow people's invocation of their right to remain silent to be used against them after they have been arrested and informed of this right. *Cf.*

*Doyle v. Ohio,* 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976) (discussing a prosecutor's use of postarrest silence to impeach a defendant's testimony at trial). In such circumstances, "a prosecutor's comment on the defendant's exercise of his [or her] fifth amendment right to remain silent may constitute error requiring reversal." *State v. Johnson,* 102 N.M. 110, 114, 692 P.2d 35, 39 (Ct.App.1984). To the extent that a trial court permits the prosecution to introduce evidence of a defendant's silence, we also apply the plain error rule. *See* Rule 11–103(D) NMRA 1999; *Lucero,* 116 N.M. at 453–54, 863 P.2d at 1074–75.

{28} These same rules do not necessarily apply when a defendant *"ha[s] not remained silent* during questioning, and the prosecutor's inquiry at trial concerned his [or her] ... statements, not his [or her] refusal or failure to make a statement." *State v. Loera,* 1996–NMSC–074, ¶ 8, 122 N.M. 641, 930 P.2d 176; *accord Johnson,* 102 N.M. at 114, 692 P.2d at 39. While "a defendant may exercise the right to remain silent even if that right is not initially asserted," *Hennessy,* 114 N.M. at 288, 837 P.2d at 1371, "[t]he fact that a defendant omits details in his [or her] statement is certainly not the kind of silence which is constitutionally protected as the defendant does not remain silent with respect to the subject matter of his [or her] statement," *Johnson,* 102 N.M. at 114, 692 P.2d at 39. As one commentator notes:

> To elicit such facts properly, the recounting witness may conclude the account in a natural fashion by indicating that there is nothing more to say because the defendant chose to stop. Otherwise, the jury might erroneously infer that the police cut the interview short before the defendant had a full opportunity to give his account.

Bennett L. Gershman, *Prosecutorial Misconduct* § 9.3(d), at 9–22 (1998).

{29} During the bench conference that followed Detective Christensen's testimony regarding Defendant's statement to police in this case, the trial court concluded that Defendant's statement was a "sharing of information" rather than an invocation of his Fifth Amendment rights. Nevertheless, the trial court proceeded to warn the prosecutor that

the State would not be allowed to argue any consciousness of guilt from the statement in question. The trial court also instructed the next witness, Detective Schofield, not to testify about it. Finally, the trial court offered to give an instruction to remind the jury of the State's burden of proof, and Defendant's trial counsel stated: "That will be sufficient, Your Honor."

{30} Under these circumstances, we agree with the trial court that the focus of the prosecutor's inquiry and the detective's testimony was a statement that Defendant made rather than his refusal or failure to make a statement. We note that unlike the prosecutor in *Hennessy*, 114 N.M. at 285, 837 P.2d at 1368, the prosecutor in this case did not argue to the jury that they should infer Defendant's guilt from the fact that he stopped talking after making the statement in question, or that Defendant had an obligation to elaborate on his prior statement. For these reasons, we conclude that Detective Christensen's account of his conversation with Defendant did not involve the kind of reference to a defendant's silence that would require reversal under the doctrine of plain or fundamental error.

## C. *Defendant's Communications with his Trial Counsel*

{31} Defendant asserts that the trial court erred by admitting testimony of other inmates regarding statements Defendant made to them about his trial strategy and his communications with his trial counsel. The prosecutor elicited testimony from one inmate who stated that Defendant said he was going to "beat this case." The prosecutor elicited testimony from another inmate who stated that Defendant said he had "confessed to his lawyer ... from the very first that he'd killed the girl," but that "his lawyer had told him that all they had was circumstantial evidence, and that if he'd just keep his mouth shut that he would get him off." Defendant did not object in a timely manner to this line of questioning at trial. On appeal, he claims that the testimony elicited by the prosecution was irrelevant and its only purpose was to impugn the integrity of Defendant's trial counsel or to improperly suggest to the jury

that they should infer Defendant's guilt from his invocation of his constitutional rights. *See* U.S. Const. amends. V, VI; N.M. Const. art. II, §§ 14 (as amended 1994), 15.

{32} We recognize that testimony or comments regarding Defendant's invocation of his right to counsel may amount to plain or fundamental error for the same reasons that we discussed with respect to Defendant's invocation of his right to remain silent. *See* Gershman, *supra*, § 9.3(c), at 9–20. Further, we recognize that it is improper for the prosecution to attack defense counsel's integrity by insinuating that defense counsel believed his client was guilty or was lying, *see* Gershman, *supra*, § 10.4(b), (c), and that communications between Defendant and his lawyer may be subject to the lawyer-client privilege, *see* Rule 11–503 NMRA 1999.

{33} In this case, however, the testimony regarding Defendant's communications with his trial counsel was not privileged because Defendant disclosed the communications to a third party. *See* Rule 11–511. The third party's testimony did not indicate that Defendant's trial counsel was speaking on Defendant's behalf or that Defendant was invoking or following his counsel's advice to "just keep his mouth shut." On the contrary, the testimony indicated that Defendant instead proceeded to share both his admissions of guilt and his lawyer's advice with others. Further, the testimony did not dwell on Defendant's trial counsel but instead turned to Defendant's conversations with his mother. Under these narrow circumstances, we conclude that the inmate's testimony regarding Defendant's communications with his trial counsel is not the kind of reference to the invocation of Defendant's constitutional rights that would amount to plain or fundamental error. *Cf. Loera*, 1996–NMSC–074, ¶ 8, 122 N.M. 641, 930 P.2d 176.

{34} With respect to the issue of whether the prosecutor's questions amounted to a conscious effort to impugn the integrity of Defendant's trial counsel, we conclude that the view of the evidence suggested by Defendant is "not the only possible construction," and that the trial court was "in a better position to weigh and analyze such situation-

ally specific questions than we." *United States v. Moore,* 104 F.3d 377, 390–91 (D.C.Cir.1997). We note that the inmate's testimony regarding Defendant's conversation with his trial counsel appeared in the context of a line of questioning about a series of inculpatory statements that Defendant made to that inmate. The prosecutor's questions focused on this series of inculpatory statements and any details about the crimes that they might reveal. These statements were relevant in proving Defendant's guilt. Thus, when we consider context, we cannot say the reference to Defendant's trial counsel was elicited for an improper purpose or that it makes the question of guilt " 'so doubtful that it would shock the conscience to permit the conviction to stand,' " *State v. Osborne,* 111 N.M. 654, 662, 808 P.2d ·624, 632 (1991) (quoting *State v. Rogers,* 80 N.M. 230, 232, 453 P.2d 593, 595 (Ct.App.1969)); *cf. State v. Clark,* 1999–NMSC–035, ¶ 54, 128 N.M. 119, 990 P.2d 793 [hereinafter *Clark III* ] (rejecting the defendant's contention that the State improperly impugned the integrity of defense counsel by accusing him of trying to circumvent the judicial system), nor did the admission of this testimony amount to plain error.

{35} Finally, we note that some portions of the inmate's testimony were consistent with Defendant's position of maintaining his innocence at trial. In particular, the statements that the evidence against Defendant was circumstantial and that he would "beat this case" were consistent with that position. Inasmuch as these statements were self-serving, we cannot say that Defendant was unfairly prejudiced by their admission. Thus, we do not find a basis for reversal in the admission of the inmate's testimony regarding Defendant's statements about his trial strategy or his communications with his trial counsel.

### D. *Risk to the State's Witnesses*

{36} Defendant asserts that the trial court erred by allowing testimony about the "inmate code" under which inmates may place their own safety in jeopardy by testifying against other inmates. Defendant also challenges the prosecutor's remark regarding the possibility that inmate witnesses "could get a shank in them."

 {37} The prosecutor's line of questioning was invited by defense counsel's repeated attacks on the credibility of the inmate witnesses. During his opening statement, for example, defense counsel stated, "the only people who are going to be pointing to [Defendant] and saying he [did] it are ... jailhouse snitches." Defense counsel continued to raise the issue of the inmates' credibility during cross-examination, when he questioned each of the inmate witnesses about possible incentives that might have given these witnesses a motive to lie. During closing argument, defense counsel urged the jury not to base its verdict "on the word of child rapers, liars, thieves, [and] people hoping to get lesser sentences when they face judgment themselves."

 {38} Given that attacking the credibility of the inmate witnesses in this manner was such a central theme of the defense, the prosecution was entitled to introduce evidence to ¨ rebut this attack. *See United States v. Mitchell,* 556 F.2d 371, 379–80 (6th Cir.1977); 4 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 607.09[1], at 607–104 to–107 (Joseph M. McLaughlin, ed., 2d ed.1999); 27 Charles Alan Wright & Victor James Gold, *Federal Practice and Procedure* § 6098, at 583–85 (1990). Further, the evidence that the prosecution introduced to support the inmate witnesses' credibility "logically refutes the specific focus of the attack" on their credibility. 27 Wright & Gold, *supra,* § 6098, at 585. Such evidence suggested that the benefits to be obtained from giving untruthful testimony favorable to the prosecution, if any existed, might be outweighed by the burdens of testifying against another inmate. Finally, we note that even though the prosecutor's remarks were invited by the defense, the trial court sustained defense counsel's objection to the statement that the inmate witnesses "could get a shank in them." The prosecutor did not make any further remarks of this nature. Under these circumstances, we conclude that this issue does not provide a basis

for reversal of Defendant's convictions or his death sentence.

### E. *Comparison to Other Cases*

{39} Relying on *State v. Chapman*, 104 N.M. 324, 326, 721 P.2d 392, 394 (1986), Defendant alleges that it was error for the prosecutor to elicit testimony comparing Defendant's case to other cases with respect to the quantity of inmate witnesses who testified for the State. We disagree. Defendant attempted to impeach the credibility of the inmate witnesses by developing the theory that the testimony of inmates in high-profile cases is motivated by a desire to obtain notoriety rather than a duty to share the truth. The State then attempted to rebut Defendant's repeated attacks on the credibility of the State's inmate witnesses by eliciting testimony that no one could recall that any inmate witnesses had testified in any other high-profile cases in San Juan County. As we have noted above, it is within the trial court's discretion to permit rebuttal in this manner when the credibility of a witness is attacked. *See generally* 4 Weinstein & Berger, *supra*, § 607.09[1]; 27 Wright & Gold, *supra*, § 6098, at 583–85. In addition, the prosecutor's reference to other cases is distinguishable from *Chapman* because there was no suggestion that Defendant's culpability in this case should be equated with the culpability of other defendants in high-profile cases. *See Chapman*, 104 N.M. at 326, 721 P.2d at 394. Rather, the testimony here focused exclusively on the credibility of the inmate witnesses, and the State was developing a comparison invited by Defendant. For these reasons, Defendant's claim is without merit.

### F. *Defendant's Prior Bad Acts*

{40} Defendant also contends that the trial court erred in admitting evidence that unfairly suggested to the jury that Defendant had a propensity to act in conformity with prior bad acts. *See* Rule 11–404(B) NMRA 1999. According to Defendant, the State introduced improper propensity evidence at the penalty phase of his trial by calling the victim of a crime he committed in 1982 as a witness against him. Defendant also asserts that the State introduced improper propensity evidence at the guilt phase of his trial by eliciting testimony that he had stolen money from a witness's grandfather, that he had been arrested for driving while intoxicated (DWI), that he was previously employed with a carnival, and that he had been prepared to "shoot it out" with police prior to his arrest. For the following reasons, we disagree with Defendant's contentions regarding evidence of prior bad acts.

{41} We conclude that the evidence of Defendant's prior crime in 1982 was relevant to prove his motive for the murder in the context of the aggravating circumstance of murdering a witness. *See State v. Clark*, 108 N.M. 288, 304–05, 772 P.2d 322, 338–39 (1989) [hereinafter *Clark I* ]; *cf. Woodward*, 121 N.M. at 7–8, 908 P.2d at 237–38 ("[E]vidence of motive ... was relevant to the requisite mental state for first-degree murder."). Further, we note that the trial court gave a limiting instruction to the effect that the jury was to consider the evidence of Defendant's prior crime only for the purpose of determining whether the murder victim in the present case was killed to prevent her from reporting a crime. As in *Clark I*, 108 N.M. at 304–05, 772 P.2d at 338–39, some of the details of the prior crime were relevant and admissible for this purpose. We conclude the trial court did not abuse its discretion in admitting the evidence.

{42} The testimony suggesting that Defendant had stolen money from a witness's grandfather and that he had been arrested for DWI was brief, inadvertent, and not responsive to the prosecutor's question. In each instance, the trial court and the prosecutor stopped the testimony before the witness had a chance to elaborate; the trial court also promptly instructed the jury to disregard the statements. We conclude that "[t]here has been no showing that the trial court's prompt sustaining of objections and admonishments to the jury failed to cure the effect of the" very brief testimony in question. *State v. McGuire*, 110 N.M. 304, 313, 795 P.2d 996, 1005 (1990); *accord State v. Ferguson*, 77 N.M. 441, 444–45, 423 P.2d 872, 874–75 (1967). We also conclude that Defendant was not deprived of a fair trial because

the inadvertent statements were not elicited or emphasized by the prosecution. *See State v. Duffy,* 1998–NMSC–014, ¶ 51, 126 N.M. 132, 967 P.2d 807; *State v. McDonald,* 1998–NMSC–034, ¶¶ 27–29, 126 N.M. 44, 966 P.2d 752.

{43} Information regarding Defendant's carnival work was admissible as background evidence to show the context of other admissible evidence, namely Defendant's statements to detectives regarding his initial contact with the victim on the day of the murder, and the time frame during which Defendant made the statement to his wife that he had raped and killed a girl. *See State v. Ruiz,* 119 N.M. 515, 519, 892 P.2d 962, 966 (Ct.App.1995) (affirming the admission of evidence concerning a defendant's abuse of his child to "provide[ ] the context" for why the defendant was battering his wife); *State v. Jordan,* 116 N.M. 76, 80–81, 860 P.2d 206, 210–11 (Ct.App.1993) (affirming the admission of evidence of a prior bad act to explain the context of the victim's father's testimony and to rebut the defense theory that the father had encouraged the victim to make false accusations). *See generally* 2 Weinstein & Berger, *supra,* § 401.04[4][a] (discussing the relevance of background evidence). We note that defense counsel did not object at trial when Defendant's ex-wife testified that Defendant's carnival work involved talking to customers and "tricking their minds." In addition, Defendant himself placed his carnival work at issue when he told police that he avoided the victim when he saw her on the day of her disappearance because she looked him directly in the eye. Defendant explained that he would avoid people who looked him directly in the eye based on his carnival experience. Under these circumstances, we conclude that the issue of the carnival evidence was not preserved for appellate review, and grounds for reversal based on plain or fundamental error are not present.

{44} Defendant's post-arrest statement of his intent to "shoot it out" with officers prior to his arrest is not a prior bad act, because no evidence was presented to show that Defendant carried out his intent. In addition, his statement was admitted for the purpose of showing his consciousness of guilt, a permissible use under Rule 11–404(B). *See Ruiz,* 119 N.M. at 519, 892 P.2d at 966 (concluding that evidence of a defendant's battery of a witness was admissible to show that the defendant "was doing things consistent with admitting his guilt" and "demonstrating that he knew he was guilty"). The trial court did not abuse its discretion in admitting this evidence.

## G. *Psychological Records and Expert Testimony*

{45} The trial court granted the State's motion for discovery of confidential medical records regarding Defendant's voluntary commitment at a mental hospital prior to the crimes in question. The trial court also admitted the expert testimony of Dr. Matthews, a psychologist who had reviewed these records. Defendant asserts that the medical records were not a proper subject of discovery because he did not place his mental health at issue in the case. *See* Rule 11–504(B), (D)(3) NMRA 1999; *cf. State v. Roper,* 1996–NMCA–073, ¶ 15, 122 N.M. 126, 921 P.2d 322 (discussing whether a defendant placed his physical condition at issue for purposes of Rule 11–504(D)(3)). Defendant also asserts that Dr. Matthews' testimony was inadmissible because it was tainted by the psychologist's unlawful review of Defendant's medical records, because it did not meet the requirements for expert testimony stated in Rule 11–702 NMRA 1999, and because it unfairly invited the jury to find Defendant guilty based on a comparison with other persons who committed notorious crimes, *see Chapman,* 104 N.M. at 326, 721 P.2d at 394.

{46} The State concedes, and we agree, that the confidential medical records at issue in this case were not a proper subject of discovery because Defendant did not place his mental health at issue at any phase of his trial. *See Roper,* 1996–NMCA–073, ¶ 15 (stating that a not-guilty plea does not place a condition at issue for purposes of Rule 11–504(D)(3)). We do not agree with Defendant that the erroneous release of those records requires reversal of his convictions or his death sentence. In order to

warrant reversal, a defendant must demonstrate that an error of this type is prejudicial. *See State v. Jett,* 111 N.M. 309, 312, 805 P.2d 78, 81 (1991); Rule 11–103(A) NMRA 1999 ("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. . . ."). In this case, Defendant has not shown any prejudice resulting from the erroneous release of his medical records because none of the records were admitted at trial and the trial court took precautions to ensure that Dr. Matthews did not offer any testimony that was based on the records or any aspect of Defendant's medical history.

{47} With regard to Defendant's other objections to the testimony of Dr. Matthews, we note that these objections were not raised in a timely manner at trial. Rule 11–103(A)(1) (requiring an objection "stating the specific ground of objection" in order to challenge a trial court's admission or exclusion of evidence). Thus, we only review for fundamental or plain error. *See State v. Begay,* 1998–NMSC–029, ¶¶ 20–23, 125 N.M. 541, 964 P.2d 102.

{48} Dr. Matthews was called to testify about a statement attributed to Defendant by one of the inmate witnesses to whom Defendant confessed his crimes. The inmate witness testified that he asked Defendant why he killed the victim and that Defendant replied: "I don't know. It was like I was standing outside of myself watching myself do this." Dr. Matthews reviewed this testimony, concluded that Defendant was describing a dissociative experience, and testified that dissociative experiences are a common way of dealing with situations that are unusual, highly charged, or stressful. He also testified that a dissociative experience does not indicate a mental condition that would negate a defendant's capacity to form a deliberate intent to kill.

{49} Deliberate intent is an element of the crime of first degree murder with which Defendant was charged in this case, *see* UJI 14–201 NMRA 1999, and whether a dissociative experience affected his capacity to form such intent was at issue because of Defendant's statement that he was "outside of himself" when he killed the victim. Fur-

ther, given Defendant's failure to preserve the issue of evidentiary reliability for appellate review, we cannot say that it was plain error to conclude that Dr. Matthews's opinion about the relationship between dissociative experiences and the capacity to form a deliberate intent met the requirements of Rule 11–702. In particular, we do not agree with Defendant that the psychological significance of dissociative experiences or their relationship to a person's capacity to form a deliberate intent to kill are matters of common knowledge for which an expert opinion is unnecessary.

{50} Further, this case is distinguishable from *Chapman,* 104 N.M. at 326, 721 P.2d at 394. In that case, the defendant asserted a defense of insanity, and the State presented in rebuttal an expert who, while testifying that there was no direct relationship between paranoid schizophrenia and violence, recalled two exceptions in which notorious murders were committed by paranoid schizophrenics: the "Son of Sam" serial killer in New York, and an individual in California who killed a girl by driving his car onto a crowded sidewalk. *Id.* at 325–26, 721 P.2d at 393–94. In *Chapman,* both the State and the defendant agreed to a limiting instruction that would have cured the error in admitting the testimony by instructing the jury to disregard it, but the trial court refused to give the limiting instruction. *See id.*

{51} In contrast, the trial court in the present case had no opportunity to give a limiting instruction because Defendant did not request one. Further, Dr. Matthews did not testify about any notorious criminal nor equate Defendant's mental condition with that of another. Thus, we conclude that the admission of Dr. Matthews' testimony was neither fundamental nor plain error.

## H. *Victim Impact Evidence*

{52} Defendant contends that the trial court erred by admitting victim impact evidence during the final stage of Defendant's trial when the jury was considering whether to impose a sentence of death or life imprisonment. We recently addressed the issue of victim impact evidence in *Clark III,* 1999–

NMSC–035, ¶¶ 35–45, 128 N.M. 119, 990 P.2d 793. There we held that "victim impact evidence, brief and narrowly presented, is admissible during the penalty phase of death penalty cases." *Id.* ¶ 37. Specifically, we concluded that the admission of the victim impact evidence at issue in that case was consistent with the CFSA and did not violate constitutional guarantees. *See id.* ¶¶ 37–45. We reaffirm our holdings in *Clark III* but take note of two features of the present case that require further analysis: (1) the fact that Defendant was arrested for committing the crimes before the effective date of New Mexico's victim's rights laws, *see* N.M. Const. art. II, § 24(A)(7); NMSA 1978, § 31–26–4(G) (1995); and (2) the fact that the victim impact evidence in this case included a videotaped depiction of the victim prior to her death in addition to the testimony of two witnesses.

{53} We first address the effective date of the victim's rights laws in relation to the timing of the prosecution in this case. We note that Defendant's arrest and the crimes he committed occurred in 1994. The crime victim's rights provisions in our state constitution did not take effect until the Legislature provided statutory authority to implement them. *See* N.M. Const. art. II, § 24(C). The effective date of the relevant implementing legislation is January 1, 1995. *See* 1994 N.M.Laws, ch. 144, § 16. We conclude, however,that the admission of victim impact evidence in this death penalty case does not depend on the authority provided by the crime victim's rights laws. Rather, as we discussed in *Clark III*, 1999–NMSC–035, ¶¶ 37–38, 128 N.M. 119, 990 P.2d 793 states were free to admit this type of evidence following the United States Supreme Court's ruling in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and Sections 31–20A–1(C) and 31–20A–2(B) of the CFSA already provided statutory authority for the admission of this type of evidence in death penalty cases in New Mexico courts prior to the effective date of the crime victim's rights laws. Thus, the effective date of such laws does not affect the admission of victim impact evidence in this case.

{54} Notwithstanding any statutory authority for admitting victim impact evidence, we wish to emphasize that the Rules of Evidence requiring relevance and the balancing of unfair prejudice also apply to testimony and exhibits that are introduced in a capital felony sentencing proceeding for the purpose of showing victim impact. *See* Rules 11–402 NMRA 1999, 11–403 NMRA 1999; *cf. Ammerman v. Hubbard Broad., Inc.*, 89 N.M. 307, 311–12, 551 P.2d 1354, 1358–59 (1976) (concluding that the power to prescribe rules of evidence and procedure is constitutionally vested in this Court). Thus, certain kinds of evidence may not be admissible for this purpose even though they have some probative value. *See, e.g., United States v. McVeigh*, 153 F.3d 1166, 1221 n. 47 (10th Cir.1998) (noting that "the district court prohibited the introduction of wedding photographs and home videos"), *cert. denied*, 526 U.S. 1007, 119 S.Ct. 1148, 143 L.Ed.2d 215 (1999).

{55} In this case, however, we conclude that the trial court was careful to limit the State's presentation of victim impact testimony so that it did not exceed the boundaries established in *Payne* and its progeny. In particular, the State's presentation was limited to "evidence about the victim and about the impact of the murder on the victim's family [that] is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Payne*, 501 U.S. at 827, 111 S.Ct. 2597. The State did not attempt to present evidence regarding other topics that remain prohibited under *Booth v. Maryland*, 482 U.S. 496, 508–09, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), such as "a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence." *Payne*, 501 U.S. at 830 n. 2, 111 S.Ct. 2597

{56} We note that only two of the forty-six witnesses called by the State offered testimony about victim impact, and their testimony occupied only thirty minutes of an eighteen-day trial. The victim's mother, who had testified earlier during the guilt phase of Defendant's trial, only appeared at the penalty phase for a few minutes to lay the foundation for admitting the videotaped depiction of

the victim prior to her death; she then identified the victim by pointing at her image when it appeared on the videotape.

{57} The videotape had been edited so that it lasted only three minutes. It depicted and described a campground scene during an elk-hunting trip a few months prior to the victim's death. Neither the victim nor any other person were in view during most of the video. During the few moments when the victim did appear, she was shown eating lunch and standing beside other campers. She was dressed in a jacket and blue jeans. There were no close-ups, and she did not speak.

{58} No members of the victim's family testified regarding the emotional impact of the victim's disappearance and death. That subject was presented by a friend of the family who testified for approximately twenty-three minutes. The witness had not testified previously and was not a member of the victim's family; much of her testimony simply recounted the facts that laid the foundation for her personal knowledge of the victim and her family. *See generally* 2 Weinstein & Berger, *supra*, § 401.04[4][a] (discussing the relevance of background evidence). After laying this foundation, the witness testified that she spoke with the victim at the elk-hunting trip a few months prior to her death, and that the victim was making plans to come home to live with her mother and go to nursing school. The witness then described the impact of the victim's disappearance and death on her family.

{59} We believe the State's presentation of victim impact evidence in this case falls within the type of " 'quick glimpse of the life which [the defendant] chose to extinguish' " that we discussed in *Clark III*, 1999–NMSC–035, ¶ 39, 128 N.M. 119, 990 P.2d 793 (quoting *Payne*, 501 U.S. at 830, 111 S.Ct. 2597 (alteration in original)). We note that a still photograph of the victim prior to her death had been admitted and published to the jury without objection earlier in the trial, and that the photograph was taken during the same elk-hunting trip that was depicted in the videotape. Thus, the depiction of the victim in the videotape closely paralleled the depiction of the victim prior to her death that

the jury had viewed earlier in the trial. Under these narrow circumstances, we conclude that Defendant was not unfairly prejudiced by the admission of this videotape. *Cf. Woodward*, 121 N.M. at 10, 908 P.2d at 240 ("The erroneous admission of cumulative evidence is harmless error because it does not prejudice the defendant."); *Payne*, 501 U.S. at 832, 111 S.Ct. 2597 (O'Connor, J., concurring) (noting that victim impact evidence could not have inflamed the jury more than did the facts of the crime).

{60} We also conclude that Defendant was not unfairly prejudiced by the testimony regarding the victim's future plans and the impact of her disappearance and death on family members. *Payne* and its progeny specifically allow testimony regarding a victim's " 'uniqueness as an individual human being,' " *Payne*, 501 U.S. at 823,, 111 S.Ct. 2597 because this subject has probative value in assessing "the specific harm caused by the crime in question." *Id.* at 825, 111 S.Ct. 2597; *see also McVeigh*, 153 F.3d at 1219 (affirming the admission of testimony concerning the life history of victims); *Wiley v. Puckett*, 969 F.2d 86, 105 (5th Cir.1992) (similar); *Black v. Collins*, 962 F.2d 394, 408 (5th Cir.1992) (similar). "*Payne* specifically allows witnesses to describe the effects of the crime on their families," *McVeigh*, 153 F.3d at 1221, and the Tenth Circuit has held that such descriptions may illustrate the impact of the crime by reference to the family's "last contacts" with the victim, *McVeigh*, 153 F.3d at 1219, their efforts to learn the fate of the victim, *id.* at 1219, their reactions to learning of the victim's death, *id.*, and their efforts to cope with the loss occasioned by the victim's death, *id.* at 1220. Because such illustrations were "brief and narrowly presented," *Clark III*, 1999–NMSC–035, ¶ 37, 128 N.M. 119, 990 P.2d 793 we conclude that the victim impact evidence admitted in this case does not provide a basis for reversing Defendant's death sentence.

### III.

{61} We next review the sufficiency of the evidence. In this portion of the opinion, we address Defendant's arguments that there was insufficient evidence to sup-

port either the aggravating circumstances found by the jury or his kidnapping conviction. We do so in order "to ensure that ... a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *State v. Garcia,* 114 N.M. 269, 274, 837 P.2d 862, 867 (1992). In assessing the sufficiency of the evidence used to support the death penalty, we must apply a degree of scrutiny that reflects "the qualitative difference of death from all other punishments." *California v. Ramos,* 463 U.S. 992, 998, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983); *see also State v. Henderson,* 109 N.M. 655, 661, 789 P.2d 603, 609 (1990) (applying this form of heightened scrutiny to the Court's review of evidence used to support an aggravating circumstance under the CFSA), *overruled in part on other grounds by Clark v. Tansy,* 118 N.M. 486, 493, 882 P.2d 527, 534 (1994) [hereinafter *Clark II* ]. In particular, the CFSA does not permit the death penalty to be imposed if "the evidence does not support the finding of a statutory aggravating circumstance," Section 31–20A–4(C)(1), or "the evidence supports a finding that the mitigating circumstances outweigh the aggravating circumstances," Section 31–20A–4(C)(2). In this portion of the opinion, we address the issue of whether the evidence supports a finding that the mitigatory circumstances outweigh the aggravating circumstances, as well as other sufficiency of evidence issues.

**A.** *Kidnapping*

■■■ {62} Defendant claims that the evidence presented to the jury was insufficient to sustain either his conviction for kidnapping or his death sentence based on the aggravating circumstance of murder in the commission of a kidnapping. *See* § 31–20A–4(C) ("The death penalty shall not be imposed if: (1) the evidence does not support the finding of a statutory aggravating circumstance. . . ."); *Rojo,* 1999–NMSC–001, ¶¶ 29–33, 126 N.M. 438, 971 P.2d 829 (concluding that neither the evidence surrounding the victim's murder nor the evidence of sexual activity prior to her death was sufficient to sustain the defendant's kidnapping conviction). Defendant relies on our holding that there is not sufficient evidence of a

murder in the commission of a kidnapping when the only force used to kidnap the victim was the same force used to accomplish or attempt the sexual penetration or the murder. *See Henderson,* 109 N.M. at 661, 789 P.2d at 609. He also relies on authorities which hold that the elements of the crime of kidnapping may be subsumed within the elements of CSP for double jeopardy purposes in some circumstances, *see, e.g., State v. Crain,* 1997–NMCA–101, ¶¶ 21–22, 124 N.M. 84, 946 P.2d 1095, and that a failure to include an essential element of an offense in the jury instructions may constitute fundamental error, *see, e.g., Osborne,* 111 N.M. at 661–63, 808 P.2d at 631–33. Thus, in our discussion of the sufficiency of the evidence, we also refer to legal principles that apply in cases of double jeopardy and instructional error. We first review the evidence used to prove each element of the crime of kidnapping.

1. *Elements of Kidnapping*

{63} Defendant was convicted of kidnapping in the first degree under the law in effect prior to the 1995 amendment of Section 30–4–1. *See Foster,* 1999–NMSC–007, n. 1, 126 N.M. 646, 974 P.2d 140 (explaining the changes occasioned by the 1995 amendment of Section 30–4–1). The trial court instructed the jury on the following elements of this crime:

1. The defendant took or confined or restrained [the victim] by force or deception;

2. The defendant intended to hold [the victim] for service against her will;

3. The defendant inflicted great bodily harm on [the victim];

4. This happened in New Mexico on or about the 7th day of February, 1994.

These jury instructions were patterned on UJI 14–404 NMRA 1996 (withdrawn 1997), which corresponds to the statute in effect prior to the 1995 amendment.

■■■ {64} The Court of Appeals has observed that "[t]he key to the restraint element in kidnapping is the point at which [the v]ictim's physical association with [the d]efendant was no longer voluntary." *State v.*

*Pisio,* 119 N.M. 252, 260, 889 P.2d 860, 868 (Ct.App.1994), *quoted with approval in Foster,* 1999–NMSC–007, ¶ 32, 126 N.M. 646, 974 P.2d 140. In this case, the evidence may have suggested to the jury that Defendant's association with the victim began as a consensual encounter in which Defendant proposed to give the victim a ride. Based on Defendant's statements, the physical evidence, and the testimony of the victim's mother, however, the jury could reasonably infer that the association between Defendant and the victim became involuntary.

{65} "Because an individual's intent is seldom subject to proof by direct evidence, intent may be proved by circumstantial evidence." *Pisio,* 119 N.M. at 259, 889 P.2d at 867. Thus, to prove the intent element of kidnapping, we have allowed a jury to "infer, from evidence of acts committed at some later point during the commission of a kidnapping, that the necessary criminal intent existed at the time the victim first was restrained." *McGuire,* 110 N.M. at 308–09, 795 P.2d at 1000–01. The testimony regarding Defendant's indication that he "wanted to pick up a girl," his statement that he wanted to give the victim a ride because she had red hair and was young and good-looking, the fact that he used a rope that was kept ordinarily in the back of the pickup, and the evidence of acts committed at a later point in the kidnapping provide adequate support for the jury's finding that Defendant intended to hold the victim for service against her will.

{66} Based on Defendant's statements, the physical evidence, and the expert testimony of the forensic pathologist, the jury also could reasonably infer that Defendant inflicted great bodily harm on the victim when he tied her up with the intent to further restrain her. Finally, the evidence of the victim's disappearance on February 7, 1994, the evidence suggesting that the victim was killed on the date of her disappearance, and the evidence linking Defendant with the victim on that date provide substantial support for the jury's finding regarding the timing of the crime. Thus, we conclude that the evidence was sufficient to support each of the elements of kidnapping in the first degree contained in the applicable versions of the kidnapping statute and jury instructions.

2. *Whether the Kidnapping, Attempted CSP and Murder are Factually Distinct*

{67} We next address Defendant's argument that there is insufficient evidence of kidnapping because the force used to accomplish the kidnapping was the same force used to accomplish or attempt the sexual penetration or the murder. The Court of Appeals has reversed a kidnapping conviction when there was no evidence of a kidnapping that was factually distinct from a murder or a sex offense. *See Crain,* 1997–NMCA–101, ¶ 21, 124 N.M. 84, 946 P.2d 1095 (concluding that "kidnapping cannot be charged out of every CSP [in the third degree] without some force, restraint, or deception occurring either before or after the sexual penetration"). When there is evidence that the perpetrator forcibly abducted the victim before attempting sexual penetration or continued to use *force or restraint after the sex act* was completed, however, we have rejected the proposition that the kidnapping is indistinguishable from the sex offense. *See McGuire,* 110 N.M. at 307–09, 795 P.2d at 999–1001 (concluding that there was substantial evidence to support independent factual bases for kidnapping and CSP convictions when the incident began as a forcible abduction and the use of force continued after the victim was sexually assaulted). We also have rejected the proposition that kidnapping and murder are unitary conduct when the force used to complete the kidnapping was not the same as the force used to kill the victim. *See Foster,* 1999–NMSC–007, ¶ 30, 126 N.M. 646, 974 P.2d 140. We are not certain that Defendant's argument has support in our cases. We are persuaded, however, that in this case there was sufficient evidence of a kidnapping factually distinct from both the attempted CSP and the murder.

{68} In this case, there is sufficient evidence of a kidnapping that is factually distinct from the attempted CSP because strangling a victim with a rope in the manner described above is not the kind of force or restraint that is "necessarily involved in ev-

ery sexual penetration without consent," *Crain,* 1997–NMCA–101, ¶ 21, 124 N.M. 84, 946 P.2d 1095 or "inherent in almost every CSP," *Pisio,* 119 N.M. at 259, 889 P.2d at 867. In addition, there was evidence from which the jury could find that Defendant restrained the victim when he drove away from her house toward a remote location in the hills beyond Flora Vista; consequently, the jury also could have found that the kidnapping and the attempted CSP were factually distinct on a second and different ground. The jury could have determined Defendant restrained the victim as a passenger within the pickup prior to strangling her with the rope.

{69} There is also sufficient evidence of a kidnapping that is factually distinct from the murder because the jury could reasonably infer that all of the elements of the crime of kidnapping in the first degree were satisfied by the time Defendant "tied up" the victim in order to "make love to her." *Cf. Foster,* 1999–NMSC–007, ¶ 33, 126 N.M. 646, 974 P.2d 140. Based on Defendant's statements, the physical evidence, and the forensic pathologist's testimony that a victim of strangulation may lose consciousness several minutes before he or she dies, the jury also could reasonably infer that the murder did not occur until the victim "limped down" and Defendant tied the rope around her neck another time. In addition, there was evidence from which the jury could infer that the relationship became involuntary when Defendant drove away from the victim's home. Thus, on a second and different ground, the jury had a factual basis for finding a kidnapping that was distinct from the murder, because the jury could have found the kidnapping occurred when Defendant restrained the victim prior to strangling her with a rope.

{70} Defendant has asserted that his convictions for kidnapping, attempted CSP, and first degree murder violate his right to be free from double jeopardy. We understand him to argue that, properly analyzed, his right to be free from double jeopardy precludes separate convictions for kidnapping, attempted CSP, and first degree murder. Under *Swafford v. State,* 112 N.M. 3,

14, 810 P.2d 1223, 1234 (1991), however, if there was a basis for the jury to find factually distinct bases for kidnapping, attempted CSP, and murder, then the conduct is considered non-unitary. "[S]imilar statutory provisions sharing certain elements may support separate convictions and punishments where examination of the facts presented at trial establish that the jury reasonably could have inferred independent factual bases for the charged offenses." *Id.* In this case, the jury could have reasonably inferred that the kidnapping, attempted CSP, and murder were factually distinct. Under these circumstances, separate convictions are possible; the protection against double jeopardy is not applicable.

{71} We acknowledge that double jeopardy principles may require reversal of a conviction when the jury instructions allow the jury to return a guilty verdict based on a legally inadequate alternative and the record contains no indication of whether or not the jury relied on that alternative. *See Foster,* 1999–NMSC–007, ¶ 27, 126 N.M. 646, 974 P.2d 140. We also acknowledge that in this case there were at least two different times at which the jury might have determined the kidnapping was complete: when Defendant drove away from the victim's house toward a remote location in the hills above Flora Vista and when he began to restrain her with the rope. We believe the jury could have relied on either time in order to satisfy its obligation to find a kidnapping factually distinct from attempted CSP.

3. *Elements of Murder in the Commission of Kidnapping*

{72} We next review the evidence used to prove each element of the aggravating circumstance of murder in the commission of kidnapping. *See* § 31–20A–5(B). The trial court instructed the jury on the following elements of this aggravating circumstance:

1. The crime of kidnapping was committed;

2. [The victim] was murdered while defendant was committing the kidnapping;

3. The murder was committed with the intent to kill.

This jury instruction is patterned on UJI 14–7015 NMRA 1999.

 {73} As noted in the committee commentary to UJI 14–7015 and in *Henderson,* 109 N.M. at 661, 789 P.2d at 609, the aggravating circumstance of murder in the commission of kidnapping does not follow automatically from a guilty verdict on the underlying offenses of kidnapping and murder. "[E]stablishing the elements of an aggravating circumstance is not the same thing as establishing the elements of a crime." *Id.* at 661, 789 P.2d at 609.

 {74} It would be possible to read *Henderson* as holding that Section 31–20A–5(B) requires not only an intent to kill but also an intent to "kill[ ] in the commission of a kidnapping." 109 N.M. at 661, 789 P.2d at 609. However, we reject any inference in *Henderson* that Section 31–20A–5(B) requires proof of a specific intent for the aggravating circumstance of murder in the commission of kidnapping. *See Henderson,* 109 N.M. at 665, 789 P.2d at 613. (Ransom, J., concurring in part, dissenting in part). The statutory reference was not an attempt to confine the aggravating circumstance of kidnapping to situations in which a jury could find a defendant had formed the specific intent to kidnap and then murder the victim. Rather, in addition to proving that the crime of kidnapping was committed, the aggravating circumstance of murder in the commission of kidnapping requires proof that "the murder was committed with intent to kill" and was committed "in the commission of . . . [kidnapping]." Section 31–20–A–5(B); *accord* UJI 14–7015. "Even if the jury has found the defendant guilty of a felony murder in the commission of a kidnapping, it must also find that the murder was committed with an intent to kill in order to find this aggravating circumstance." UJI 14–7015 committee commentary.

 {75} We conclude that the State presented sufficient evidence to prove the elements of the aggravating circumstance of murder in the commission of kidnapping. The fact that all of the elements of the crime of kidnapping were satisfied before the murder occurred does not preclude a finding that the victim was murdered in the commission of kidnapping because, in this case, the evidence substantially supports a finding that "the kidnapping continued throughout the course of [D]efendant's other crimes and until the time of the victim's death." *McGuire,* 110 N.M. at 309, 795 P.2d at 1001. In addition, a finding that Defendant committed the murder with the intent to kill can be inferred from the same evidence of intent upon which the jury relied to find Defendant guilty of first degree murder under Section 30–2–1(A)(1), which requires a "willful, deliberate and premeditated killing." Defendant has not challenged the sufficiency of the evidence that the killing was "willful, deliberate and premeditated," and we find no reasonable basis for doing so. *Cf. Rojo,* 1999–NMSC–001, ¶ 24, 126 N.M. 438, 971 P.2d 829 (reasoning that evidence concerning the method and motive for a killing was sufficient to support a finding that the defendant acted with deliberate intent).

 {76} Finally, we address Defendant's reliance on the doctrine of fundamental error as it applies to the essential elements in the jury instructions. Defendant asserts that there is fundamental error in the trial court's instructions to the jury regarding the aggravated circumstance of murder in the commission of a kidnapping because these instructions did not clearly inform the jury that it would have to find the kidnapping to be factually distinct from the attempted CSP and the murder. We disagree. Our past cases have applied the doctrine of fundamental error to the omission of a disputed essential element of an offense. *See, e.g., Osborne,* 111 N.M. at 662, 808 P.2d at 632. In this case, the jury was instructed on all of the elements of the aggravating circumstance of murder in the commission of kidnapping in accordance with UJI 14–7015 and Section 31–20A–5(B). The instruction requested by Defendant for the first time on appeal is not an essential element of this aggravating circumstance. Rather, it is a definitional instruction. "[A] failure to give a definitional instruction is not a failure to instruct on an

essential element." *Crain*, 1997–NMCA–101, ¶ 11, 124 N.M. 84, 946 P.2d 1095.

{77} We review Defendant's claim of instructional error to determine whether the instructions given were so ambiguous as to create fundamental error. "Fundamental error may be resorted to if the question of guilt 'is so doubtful that it would shock the conscience to permit the conviction to stand.'" *Osborne*, 111 N.M. at 662, 808 P.2d at 632 (quoting *Clark I*, 108 N.M. at 297, 772 P.2d at 331). Ambiguous instructions are those that are "capable of more than one interpretation." *State v. Parish*, 118 N.M. 39, 42, 878 P.2d 988, 991 (1994). When a jury instruction is ambiguous, then we look to see if the jury instructions as a whole cure the ambiguity. *See id.* In this case, the definitions of "murder," "kidnapping," and "attempted CSP" already were given to the jury in the essential elements instructions for those offenses, and each of those offenses contains distinct elements. Thus, we conclude that the jury instructions as a whole were sufficient to prevent a reasonable juror from becoming confused or misdirected to an extent that would amount to fundamental error. We are satisfied that the jury understood the factual distinctions necessary to find the aggravating circumstance of murder in the commission of a kidnapping without more precise definition from the court.

### B. *Murder of a Witness*

{78} Defendant also contends that the evidence presented to the jury was insufficient to sustain the jury's finding regarding the aggravating circumstance of murder of a witness. *See* § 31–20A–5(G). The trial court instructed the jury on the following elements of this aggravating circumstance:

1. [The victim] was a witness to a crime; and

2. [The victim] was murdered to prevent [her] from reporting the crime or crimes of Kidnapping and/or Attempted [CSP].

This jury instruction was patterned on UJI 14–7023 NMRA 1999.

{79} We conclude that there was sufficient evidence regarding each element of the aggravating circumstance of murder of a witness. In past cases, we have noted that the evidence used to support this aggravating circumstance may include the defendant's statements to the effect that he or she could not let the victim go " 'because that would be the end for' " the defendant, *Clark I*, 108 N.M. at 304, 772 P.2d at 338, prior crimes that are sufficiently probative of the defendant's motive for the killing, *see id.* at 304–05, 772 P.2d at 338–39, and "[t]he lack of any other plausible motive, together with the acts of the defendant in attempting to avoid detection by destroying evidence at the scene that would tie him [or her] to the crime," *Henderson*, 109 N.M. at 660, 789 P.2d at 608.

{80} The State's use of these types of evidence in the present case is consistent with our decisions in *Clark I* and *Henderson*. To meet its burden of proving that Defendant murdered a witness to a crime "for the purpose of preventing report of the crime or testimony in any criminal proceeding," Section 31–20A–5(G), the State introduced statements that Defendant made to his wife (and which he acknowledged in the presence of other witnesses) to the effect that he had raped a girl and killed her to prevent her from reporting the rape. The State also introduced evidence that Defendant had served a prison sentence for a prior conviction after a witness reported the crime in spite of Defendant's threat to kill her for doing so, and that Defendant had attempted to avoid detection in the present case by disposing of the victim's body in a remote location and cleaning the pickup in which he had abducted her. Finally, evidence was presented to show that Defendant did not know the victim prior to his commission of the crimes in question, and the State argued that the jury should infer from this evidence that there was no other plausible motive for the killing.

### C. *Mitigating Circumstances*

{81} Although Defendant does not raise the issue in his brief, we conduct a mandatory statutory review of whether the evidence supports a finding that the mitigat-

ing circumstances outweigh the aggravating circumstances in this case. *See* § 31–20A–4(A), (C)(2); *Clark III*, 1999–NMSC–035, ¶¶ 81–82, 85–86, 128 N.M. 119, 990 P.2d 793. Defendant requested and received a jury instruction telling the jury that it must consider "the defendant's age; any remorse of the defendant; the circumstances of the offense which are mitigating, and anything else which would lead you to believe that the death penalty should not be imposed." The only evidence of mitigating circumstances that Defendant presented during the penalty phase of his trial, however, consisted of a brief allocution and a stipulation regarding his age. (He was thirty-four years old at the time of the trial.) Under these circumstances, the evidence does not support a finding that the mitigating circumstances outweigh the aggravating circumstances. Therefore, this issue does not provide a basis for reversal of Defendant's death sentence.

## IV.

{82} Defendant asserts that the trial court's rulings in the jury selection process violated his constitutional right to an impartial jury, *see* N.M. Const. art. II, § 14 (as amended 1994), and that the trial court unconstitutionally denied the right of some venire members to sit upon the jury on account of their religion, *see* N.M. Const. art. VII, § 3. Specifically, he asserts that the trial court improperly restricted the scope of voir dire, failed to excuse two members of the venire for cause even though they were predisposed to vote for the death penalty, and improperly excluded other members of the venire on the basis of their religious or cultural beliefs.

{83} In general, we review the trial court's rulings regarding the selection of jurors for an abuse of discretion because "the trial court is in the best position to 'assess a juror's state of mind,' based upon the juror's demeanor and credibility." *Clark III*, 1999–NMSC–035, ¶ 5, 128 N.M. 119, 990 P.2d 793 (quoting *State v. Sutphin*, 107 N.M. 126, 129, 753 P.2d 1314, 1317 (1988)). We apply the same standard of review to the trial court's determination of how voir dire should be conducted, *see Clark III*, 1999–NMSC–035,

¶ 20, 128 N.M. 119, 990 P.2d 793 because assuring the selection of an impartial jury may require that counsel be "allowed considerable latitude in questioning prospective [jury] members." *Sutherlin v. Fenenga*, 111 N.M. 767, 777, 810 P.2d 353, 363 (Ct.App. 1991) (citation and internal quotation marks omitted) (alteration in original).

{84} In death penalty cases, however, the trial court's discretion is cabined by UJI 14–121 NMRA 1999, which creates "a procedural requirement" of posing questions to prospective jurors about their views of the death penalty. In order to prevent such questioning from "reflect[ing] on [the defendant's] innocence or guilt in any way," UJI 14–121 states that such questions should "not refer to this case specifically, but to [the prospective jurors'] views in general." In accordance with this instruction, the trial court in this case would not allow defense counsel to refer prospective jurors specifically to "the case we are dealing with now." At the same time, the trial court allowed counsel for both sides considerable latitude in asking generalized, hypothetical questions. We find no abuse of discretion in the trial court's attempt to balance the need for such latitude against the necessity of complying with UJI 14–121.

{85} Based on its evaluation of the statements elicited from a prospective juror during voir dire, "[t]he trial court may properly exclude a juror for cause if the juror's views would substantially impair the performance of the juror's duties in accordance with the instructions and oath." *Clark III*, 1999–NMSC–035, ¶ 10, 128 N.M. 119, 990 P.2d 793. Prospective jurors who "will automatically vote for the death penalty in every case" fall into this category because they "will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require [them] to do." *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). In this case, Defendant contends that the trial court failed to excuse two prospective jurors for cause even though they made statements suggesting that they would automatically vote for the death penalty in every case.

While we agree that prospective jurors who would vote automatically for the death penalty must be excused in this context, we disagree with Defendant's characterization of the prospective juror's statements in this case. In evaluating the views of the two prospective jurors in question, the trial court gave more credence to statements suggesting an open mind and less credence to other statements suggesting an automatic vote. Because the significance of each statement depends on the credibility and demeanor of the prospective juror at the time it was made, we believe that " 'deference must be paid to the trial judge who sees and hears the juror.'" *Clark III*, 1999–NMSC–035, ¶ 5, 128 N.M. 119, 990 P.2d 793 (quoting *Wainwright v. Witt*, 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). We find no abuse of discretion in the trial court's denial of Defendant's motions to excuse these two prospective jurors for cause.[2]

{86} For the same reasons that courts exclude prospective jurors who will automatically vote *for* the death penalty in every case, they also may exclude prospective jurors who will always vote *against* the death penalty. *See Clark III*, 1999–NMSC–035, ¶ 7, 128 N.M. 119, 990 P.2d 793. Prospective jurors may express a variety of reasons for an automatic vote against the death penalty. *See id.* ¶ 6. The religious views of some prospective jurors may have provided the reason why they would have cast such an automatic vote in this case. For this reason, Defendant contends that the trial court improperly excluded these prospective jurors on account of their religion. We disagree. For purposes of disqualifying an individual from serving on a jury in a death penalty case, it is the fact that the individual's vote will be automatic, rather than the particular reasons he or she gives for casting such an automatic vote, that is dispositive. *See id.* ¶ 16. We conclude that the trial court did not abuse its discretion in excluding prospective jurors who indicated that they would automatically vote against the death penalty in this case, because the basis for excluding

these individuals was their inability to apply the law rather than their religious views. *See id.* ¶ 17.

## V.

{87} Defendant's next contention is that the trial court erred in refusing Defendant's requested jury instructions on the lesser included offenses of involuntary manslaughter and false imprisonment. " 'Instructions on lesser included offenses should only be given when there is evidence that the lesser offense is the highest degree of the crime committed.'" *State v. McGruder*, 1997–NMSC–023, ¶ 11, 123 N.M. 302, 940 P.2d 150 (quoting *State v. Southerland*, 100 N.M. 591, 596, 673 P.2d 1324, 1329 (Ct.App. 1983)). In order to find reversible error in the trial court's ruling on this issue, "we 'must be able to articulate an analysis the jury might have used to determine guilt, and that analysis must be reasonable.'" *Id.* ¶ 13 (quoting *State v. Sizemore*, 115 N.M. 753, 758, 858 P.2d 420, 425 (Ct.App.1993)).

{88} Defendant asserts that the jury might have determined that involuntary manslaughter, not second degree murder, was the highest degree of homicide committed in this case based on the theory that the victim's death was an accidental consequence of Defendant's placement of the rope around the her neck. This "theory is not a reasonable view of the evidence." *Pisio*, 119 N.M. at 260, 889 P.2d at 868; *cf. McGruder*, 1997–NMSC–023, ¶¶ 13–14, 123 N.M. 302, 940 P.2d 150 (rejecting the theory that the defendant "held the gun to [the victim's] head, intending to frighten him, and then accidentally fired"). "Manslaughter is the unlawful killing of a human being without malice," NMSA 1978, § 30–2–3 (1994), and "[i]nvoluntary manslaughter consists of manslaughter committed in the commission of an unlawful act not amounting to [a] felony, or in the commission of a lawful act which might produce death in an unlawful manner or without due caution and circumspection,"

---

2. Because we conclude that the trial court did not abuse its discretion in denying Defendant's motions, it is not necessary for us to reach the question whether Defendant was prejudiced by his use of two peremptory challenges to exclude these two prospective jurors after his motions were denied.

Section 30–2–3(B). Under no view of the evidence did the victim consent to being strangled by a rope, and under no view of the evidence is such a non-consensual strangling "a lawful act" or even "an unlawful·act not amounting to a felony." At a minimum, an intentional but non-fatal strangulation with a ligature would have been an aggravated battery under NMSA 1978, § 30–3–5(C) (1969), which is a third degree felony. Thus, even under Defendant's theory of an "accidental" death by intentional strangulation, the crime does not meet the statutory definition of an involuntary manslaughter.

■ {89} With respect to his kidnapping conviction, Defendant asserts that the jury might have determined that the highest degree of the crime committed was false imprisonment based on a theory that the victim was unlawfully restrained but not held for service. *See State v. Fish*, 102 N.M. 775, 779, 701 P.2d 374, 378 (Ct.App.1985) (noting that the distinction between kidnapping and false imprisonment is "whether the defendant intended to hold the victim for service against her will"). Again, Defendant's "theory is not a reasonable view of the evidence." *Pisio*, 119 N.M. at 260, 889 P.2d at 868. Even if the jury believed that Defendant's association with the victim began as a consensual encounter, no reasonable view of the evidence supports the theory that the Defendant did not intend to hold the victim for service when he confined her in his vehicle, made sexual advances, drove her to a remote location, and "tied her up." According to Defendant's own "accidental strangulation" theory, he was using the rope to restrain the victim for sexual purposes, but tying a rope around a victim's neck is not "necessarily involved in every sexual penetration without consent," *Crain*, 1997–NMCA–101, ¶ 21, 124 N.M. 84, 946 P.2d 1095. On these facts, the jury was precluded from considering the theory that false imprisonment is the highest degree of crime committed.

## VI.

■ {90} Defendant asserts that, if we assume his convictions were based on non-unitary conduct, the trial court erred in running Defendant's sentences for attempted CSP and kidnapping concurrently instead of consecutively. According to Defendant, both the State and the trial court erroneously viewed concurrent sentencing as a cure for a double jeopardy violation and erroneously applied the common law doctrine of merger. *See State v. Meadors*, 121 N.M. 38, 49 n. 10, 908 P.2d 731, 742 n. 10 (1995) ("Merger is actually a common law doctrine for analyzing multiple punishment issues that has not been adopted in New Mexico."). We conclude that the trial court's reference to the merger doctrine is of no consequence. Under *State v. Franks*, 119 N.M. 174, 177, 889 P.2d 209, 212 (Ct.App.1994), "we may affirm a district court ruling on a ground not relied upon by the district court, [however] we will not do so if reliance on the new ground would be unfair to appellant." (Citation omitted.) Given Defendant's failure to object to the concurrent sentencing below and the lack of any need for additional fact-finding on this issue, we are not convinced that it would be unfair to affirm the trial court's sentencing decision for the noncapital crimes based on an alternative rationale.

■ {91} Apart from double jeopardy considerations, "whether multiple sentences for multiple offenses run concurrently or consecutively is a matter resting in the sound discretion of the trial court." *State v. Padilla*, 85 N.M. 140, 143, 509 P.2d 1335, 1338 (1973). Given the common law presumption in favor of concurrent sentences, *see id.* at 142, 509 P.2d at 1337, the constitutional prohibition against disproportionate sentences, *see* U.S. Const. amend. VIII; N.M. Const. art. II, § 13 (as amended 1988), and the absence of a statute requiring consecutive sentences in this instance, *see Padilla*, 85 N.M. at 143, 509 P.2d at 1338, we are not convinced that the trial court abused its discretion in ordering Defendant's sentences for kidnapping and attempted CSP to run concurrently.

■ {92} Defendant asserts, however, that the trial court's decision to issue concurrent sentences for kidnapping and attempted CSP has additional significance in this case because running these sentences concurrently weakened his argument against the death

penalty. To support this assertion, Defendant relies on this Court's statement that "[t]he length of incarceration facing a capital defendant before he can be considered for parole, as an alternative to a death sentence, is information that must be provided to a jury before it deliberates on the capital charge *if* the defendant decides it is in his best interest to have the jury apprised of this information." *Clark II*, 118 N.M. at 492, 882 P.2d at 533. Defendant asserts that if his sentences for the noncapital offenses had run consecutively, he would have been able to argue to the jury that his ineligibility for parole would last for forty-nine years. Defendant only was able to argue that his ineligibility for parole would last for forty-two years because these sentences were run concurrently. According to Defendant, the jury might have looked more favorably upon a life sentence for the crime of murder if they knew Defendant would be ineligible for parole for forty-nine years instead of forty-two years.

{93} Defendant asserts that the concurrent sentences for the crimes of kidnapping and CSP improperly influenced the jury's decision to impose the death penalty for the crime of murder. Our decision in *Clark II*, 118 N.M. at 492–93, 882 P.2d at 533–34, only required the trial court to impose sentences for noncapital offenses and to inform the jury of these sentences (at a defendant's request) prior to the jury's deliberations on the capital offense. Moreover, in this case Defendant did not request consecutive sentencing in the trial court, nor has he shown that the concurrent sentences were sought or imposed for the purpose of weakening his argument against the death penalty. For these reasons, we do not agree with Defendant that his sentencing for murder was unfairly prejudiced by an error in his sentencing for kidnapping and attempted CSP, and we affirm his concurrent sentences for these noncapital offenses.

## VII.

{94} Defendant contends that some of the prosecutor's remarks during jury selection, opening statements, and closing arguments constituted misconduct that deprived Defendant of a fair trial. In discussing the trial court's evidentiary rulings, we have addressed Defendant's claims that the prosecutor erred by commenting on Defendant's silence, impugning the integrity of his trial counsel, insinuating that the inmate witnesses who testified against him were in danger, and comparing his case to other cases with respect to the quantity of such witnesses. We now address Defendant's additional challenges to the prosecutor's statements that allegedly suggested to jurors that they were not responsible for their decision, gave personal opinions vouching for the strength of the State's case and the appropriateness of the death sentence, alluded to incriminating evidence that was not in the record, argued that lack of remorse or the failure to show other mitigating evidence was an additional aggravating circumstance, and suggested that the jury should return its verdict based on improper considerations such as the community's grief and outrage, the need to protect the community, and the jurors' concerns as parents.

{95} When an issue of prosecutorial misconduct is preserved by a timely objection at trial, we review the trial court's ruling on a claim under the deferential standard of "abuse of discretion," *State v. Stills*, 1998–NMSC–009, ¶ 49, 125 N.M. 66, 957 P.2d 51, because "the trial court is in the best position to evaluate the significance of any alleged prosecutorial errors," *Duffy*, 1998–NMSC–014, ¶ 46, 126 N.M. 132, 967 P.2d 807. When the trial court had no opportunity to rule on a claim of prosecutorial misconduct because the defendant did not object in a timely manner, we review the claim on appeal for fundamental error. *See State v. Peters*, 1997–NMCA–084, ¶ 39, 123 N.M. 667, 944 P.2d 896; *cf. Rojo*, 1999–NMSC–001, ¶ 55, 126 N.M. 438, 971 P.2d 829 (noting that " 'the concepts of fair trial and substantial justice are identical' " in this context (quoting *Hennessy*, 114 N.M. at 287, 837 P.2d at 1370)). Prosecutorial misconduct rises to the level of fundamental error when it is "so egregious" and "had such a persuasive and prejudicial effect on the jury's verdict that the defendant was deprived of a fair trial." *Duffy*, 1998–NMSC–014, ¶¶ 46–47, 126 N.M.

132, 967 P.2d 807; *accord Rojo,* 1999–NMSC–001, ¶ 55, 126 N.M. 438, 971 P.2d 829. An isolated, minor impropriety ordinarily "is not sufficient to warrant reversal," *State v. Brown,* 1997–NMSC–029, ¶ 23, 123 N.M. 413, 941 P.2d 494, because a fair trial is not necessarily a perfect one, *see State v. Moore,* 94 N.M. 503, 505, 612 P.2d 1314, 1316 (1980); *cf. State v. Henderson,* 1998–NMSC–018, ¶ 20, 125 N.M. 434, 963 P.2d 511 ("Judges have wide discretion in controlling the proceedings before them and a defendant is not entitled to a perfect trial.").

{96} We review each of Defendant's allegations of prosecutorial misconduct individually in addition to considering their cumulative effect. We conclude, however, that the alleged instances of prosecutorial misconduct in this case do not rise to the level of fundamental error regardless of whether they are considered individually or cumulatively.

### A. *The Jury's Responsibility for its Verdict*

{97} Defendant claims that the prosecutor's closing· argument improperly suggested to jurors that they were not responsible for their decision to impose the death penalty. The prosecutor stated, "I'm not going to wink at you and suggest, oh, well, they never kill anybody, never have executed anybody in New Mexico." *See Caldwell v. Mississippi,* 472 U.S. 320, 325, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The State responds that Defendant did not make a timely objection to this remark, and that Defendant has taken the remark out of context. *See State v. Gonzales,* 110 N.M. 166, 169, 793 P.2d 848, 851 (1990). In particular, the State points out that the prosecutor's very next sentence was that "I think we need to approach this case as though the death sentence will be carried out," and that the prosecutor repeatedly emphasized both the gravity and the finality of the jury's decision throughout his argument. Defendant replies that the prosecutor was using a rhetorical device, urging the jury to consider an improper factor while disingenuously disclaiming any intention to rely on that factor. *See Collier v. State,* 101 Nev. 473, 705 P.2d 1126

(1985); *Jacobs v. State,* 101 Nev. 356, 705 P.2d 130 (1985).

{98} Although we acknowledge that the prospect of reversal on appeal is not a proper consideration for a jury, *see Caldwell,* 472 U.S. at 330, 333, 105 S.Ct. 2633 we agree with the State that any implicit reference to such a prospect in this case did not amount to fundamental error given the context of the prosecutor's argument as a whole, *see Gonzales,* 110 N.M. at 169, 793 P.2d at 851. We presume that the jury understood the prosecutor's words according to their ordinary meaning. This case is distinguishable from *Collier* or *Jacobs.* In those cases, the improper remark was one of several. *See Steese v. State,* 114 Nev. 479, 960 P.2d 321, 333 (1998) (concluding that a prosecutor's remark "simply did not approach the level of rhetorical excess discussed in *Collier* "); *cf. Moore v. Gibson,* 195 F.3d 1152, 1175 (10th Cir.1999) (holding that the prosecution's statements to the jury regarding the jury's role in determining a death sentence, "viewed in the context of the entire trial[,] did not affirmatively mislead the jury regarding its responsibility for determining punishment, and thus did not violate *Caldwell* ").

{99} Defendant claims that, during jury selection, the prosecutor improperly vouched for the strength of the State's case and the appropriateness of the death sentence by telling the venire, in excessive detail, about his personal experience with the death penalty, and by mentioning that the police and the district attorney's office "obviously" thought Defendant was guilty. Defendant claims that the improper vouching continued during closing argument when the prosecutor stated his view that "the death penalty is a moral verdict in this case."

{100} We do not agree with Defendant that he was unfairly prejudiced by the prosecutor's statement during closing argument regarding the morality of the death penalty. The trial court promptly sustained Defendant's objection to that statement. As in *McGuire,* 110 N.M. at 313, 795 P.2d at 1005, "[t]here has been no showing that the trial court's prompt sustaining of objections and admonishments to the jury failed to cure the effect of the prosecutor's overreaching."

**516**

In addition, the prosecutor complied with the trial court's ruling and did not emphasize the statement any further. *See Duffy,* 1998–NMSC–014, ¶ 51, 126 N.M. 132, 967 P.2d 807 (reasoning that the defendant was not deprived of a fair trial when an improper statement was not emphasized by the prosecution). The trial court's ruling on Defendant's objection was consistent with its earlier ruling that excluded the opinions of religious leaders regarding the morality of the death penalty, which Defendant had sought to introduce as evidence of a mitigating circumstance. We conclude that the trial court did not abuse its discretion with regard to either ruling. *See Clark III,* 1999–NMSC–035, ¶¶ 28, 32, 128 N.M. 119, 990 P.2d 793.

{101} With respect to jury selection, we note that Defendant failed to object to many of the prosecutor's remarks that he now challenges on appeal. Further, we do not believe that the remarks were unfairly prejudicial when viewed in their proper context. Both parties were faced with the difficult task of getting prospective jurors to share their highly personal views about the death penalty during voir dire. Viewed in this context, the prosecutor's brief allusions to his own personal experience with the death penalty only served as a means of facilitating candid responses from the venire. The prosecutor also tried to facilitate such responses by repeatedly emphasizing that his own views were unimportant, that he was not trying to persuade jurors one way or the other, and that there was no right or wrong answer to his questions about the death penalty. The trial court has considerable discretion in controlling the jury selection process, *see Clark III,* 1999–NMSC–035, ¶ 20, 128 N.M. 119, 990 P.2d 793 and we conclude that the trial court did not abuse its discretion or deny Defendant an impartial jury when it allowed the prosecutor some latitude in his efforts to elicit the venire members' personal views about the death penalty. *See Sutherlin,* 111 N.M. at 777, 810 P.2d at 363 ("In order for counsel to make intelligent use of such rights as he [or she] has in the selection of a jury, he [or she] is usually allowed considerable latitude in questioning prospective [jury] members." (citation and internal quotation marks omitted) (final alteration in original)).

{102} We also conclude that the prosecutor did not deprive Defendant of a fair trial when he stated that "obviously" the police and the district attorney's office thought Defendant was guilty. While we agree with the general rule that it is improper for prosecutors to vouch for their cases, *see generally* Gershman, *supra,* § 10.5, we are not persuaded that the prosecutor's remarks in this case, when taken in context, were the kind of vouching that is prejudicial enough to deprive Defendant of a fair trial. We note that the remarks were made during voir dire as the prosecutor inquired whether prospective jurors could presume Defendant's innocence even though they knew that Defendant had been charged with several crimes. *Cf. State v. Polsky,* 82 N.M. 393, 404, 482 P.2d 257, 268 (Ct.App.1971) (noting the possibility that a prosecutor's belief in a defendant's guilt may be inferred from the "fact that the [prosecutor] files an information, and then forcefully prosecutes the defendant thereunder"). The purpose of this inquiry was to identify and exclude jurors who could *not* presume Defendant's innocence because of their knowledge that he had been arrested and charged with a crime. The prosecutor further emphasized the presumption of innocence during closing argument when he stated that: "This is a case [not for] the District Attorney's office to make the call on; this is one for you to make the call as to guilt and as to the penalty." Under these circumstances, we are not persuaded that reasonable jurors would construe the prosecutor's remarks as an argument that they should find Defendant guilty simply because the police and the district attorney's office think he is guilty, nor are we persuaded that reasonable jurors would adopt a construction of the prosecutor's remarks that would cause them to disregard the trial court's repeated instructions regarding the State's burden of proof. *See Gonzales,* 110 N.M. at 169, 793 P.2d at 851; *cf. Clark III,* 1999–NMSC–035, ¶ 55, 128 N.M. 119, 990 P.2d 793 (rejecting the contention that a prosecutor's remarks implied that the death penalty was mandatory).

**B.** *Evidence Not in the Record*

{103} Defendant contends that the prosecutor's closing argument in this case alluded to evidence not in the record, and that these allusions unfairly appealed to the jurors' personal fears and denigrated the criminal justice system. *See* Gershman, *supra,* § 10.6 (discussing reference to matters outside the record as a form of prosecutorial misconduct). Defendant points to the prosecutor's remarks during closing argument that "we're limited to that evidence which is admissible to ask for a conviction," and that "because we cherish our individual liberties so, we've been willing to make a societal tradeoff . . . that . . . results, often times, in dangerous people going free when they really did something and perhaps killing again." Defendant also asserts that the prosecutor referred to evidence not in the record when he predicted in his opening statement that the State was going to present evidence that Defendant's own mother-in-law thought he was guilty or capable of killing the victim. Defendant's mother-in-law never provided such testimony during the trial.

{104} We agree with Defendant that it is improper for the prosecution to refer the jury to matters outside the record or to make certain kinds of "law and order" appeals. *See* Gershman, *supra,* §§ 10.2(a), 10.6. Viewing the prosecutor's statements in context, however, we do not find that they deprived Defendant of a fair trial in this case. In particular, the prosecutor's statements did not imply that any specific evidence was being concealed from the jury, or that there was anything about Defendant or his crimes that the prosecutor wanted to divulge but could not. Absent such implications, it is more logical to construe the prosecutor's remarks as merely repeating, with emphasis, the trial court's instructions regarding the State's burden of proof and the requirement that jurors disregard evidence that is the subject of a sustained objection. *See* UJI 14–101, –102 NMRA 1999; *Gonzales,* 110 N.M. at 169, 793 P.2d at 851.

{105} Further, while it was a mistake for the prosecutor to predict that a particular piece of evidence would be presented to the jury when in fact it was not, in this case "[t]here is nothing indicating bad faith on the part of the prosecutor in referring to the witness in [the prosecutor's] opening statement." *State v. Fuentes,* 91 N.M. 554, 558, 577 P.2d 452, 456 (Ct.App.1978). Defendant's mother-in-law did testify as a witness for the State, and her testimony did provide some evidence of Defendant's guilt, although it did not contain the exact statement referenced by the prosecutor during his opening statement.

{106} Finally, we do not find that Defendant was deprived of a fair trial by the prosecutor's statements about a "societal trade-off" in which dangerous people may go free in order to protect cherished individual liberties. Viewed in context, we do not believe these comments suggested to the jury that they should ignore their responsibility to apply the law. Rather, the prosecutor's comments appear as a rebuttal of defense counsel's closing argument. Defense counsel had told the jurors that they were "protectors of all of us" and that "the Constitution . . . says that innocent people [are not to] be convicted for things they didn't do." The prosecutor's response to this argument acknowledged the importance of such constitutional principles but maintained that it was unnecessary for the jury to find Defendant not guilty in order to protect these principles because the evidence admitted at trial was enough to prove Defendant's guilt beyond a reasonable doubt. Under these circumstances, the prosecutor's comments during rebuttal were invited. *See Clark III,* 1999–NMSC–035, ¶ 52, 128 N.M. 119, 990 P.2d 793; *Gonzales,* 110 N.M. at 169, 793 P.2d at 851. We conclude that they did not deprive Defendant of a fair trial.

**C.** *Lack of Mitigating Circumstances*

{107} Section 31–20A–5 of the CFSA limits the types of aggravating circumstances that a jury may consider in a capital felony sentencing proceeding. A defendant's failure to show any mitigating circumstances, in and of itself, is not an aggravating circumstance under the CFSA. In this case, Defendant asserts that the prosecutor violated Section 31–20A–5 by arguing to the jury that Defendant's lack of remorse and his failure to show

other mitigating circumstances amounted to an additional aggravating circumstance supporting the death penalty. We disagree with Defendant's characterization of the prosecutor's argument.

{108} Sections 31–20A–2 and 31–20A–6 allow the defendant in a capital felony sentencing proceeding to present mitigating circumstances for the jury's consideration in deciding whether to impose a death sentence. In this case, Defendant's mitigating evidence included a brief allocution in which he expressed remorse for the killing, and the trial court instructed the jury, at Defendant's request, that it must consider Defendant's "age; any remorse of the [D]efendant; the circumstances of the offense which are mitigating, and anything else which would lead you to believe that the death penalty should not be imposed." Once Defendant asserted mitigating circumstances, the prosecutor was entitled to offer a rebuttal concerning that issue. *See Clark III*, 1999–NMSC–035, ¶ 52, 128 N.M. 119, 990 P.2d 793. We construe the prosecutor's remarks about Defendant's lack of remorse and failure to show other mitigating evidence as an attempt to rebut Defendant's assertion of mitigating circumstances. We do not view such a rebuttal as an attempt to create an additional, nonstatutory aggravating circumstance. For these reasons, the State's rebuttal did not violate the CFSA or deprive Defendant of a fair trial.

### D. *Other Improper Considerations*

{109} Defendant contends that it was misconduct for the prosecutor to argue that the jury should return its verdict based on improper considerations such as "community outrage," society's right to grieve, the fact that "this is the stuff that we, as parents, fear for our children," and the need for "a stern message from you that this conduct won't be tolerated." The prosecutor made these remarks during his rebuttal of Defendant's closing argument in the penalty phase of the trial. Defendant's closing argument had a religious theme, with remarks about leaving Defendant's life "in God's hands" because "a long time ago, a man died on a cross [and] His final words about His killers were

words of forgiveness." After a brief bench conference that followed the prosecutor's rebuttal, the trial court gave the jurors the following limiting instruction:

> Any suggestion that you as a jury have some obligation to express a particular opinion on a case through your verdict, or to carry any kind of message through your verdict, is totally inappropriate. This case must be decided upon the facts that you have before you in this court, and not on any ... play upon your desire to please a public or to carry out any particular aim of ... society. Deal with this case on its facts in the manner in which I've instructed you, putting aside your bias and prejudices, and deciding the case solely upon what you've heard.

Shortly after this instruction was given, the jury retired to deliberate.

{110} We agree with the trial court that the closing arguments quoted above were improper inasmuch as they attempted to persuade the jury to reach a verdict based on biases or prejudices to which the jurors may have been susceptible because of their experiences as parents or members of a particular community or religion. *See* UJI 14–101. We admonish trial counsel for both sides to confine their remarks to arguments based on the evidence presented in the cases before them. We conclude, however, that the trial court's "curative instruction was sufficient to offset any prejudicial effect due to the [lawyers'] erroneous statement[s]." *State v. Sellers*, 117 N.M. 644, 650, 875 P.2d 400, 406 (Ct.App.1994). Reviewing all of the "comments made in closing argument in the context in which they occurred so that the [C]ourt may gain full understanding of the comments and their potential effect on the jury," *State v. Baca*, 1997–NMSC–045, ¶ 42, 124 N.M. 55, 946 P.2d 1066, we determine that the prosecutor's remarks did not deprive Defendant of a fair trial, *see Duffy*, 1998–NMSC–014, ¶¶ 46–47, 126 N.M. 132, 967 P.2d 807.

### VIII.

{111} Defendant asserts that proportionality review under Section 31–20A–

4(C)(4) of the CFSA is unconstitutional, that this Court should expand the universe of cases used for comparison in our proportionality review, and that Section 31–20A–4(C)(4) requires reversal of his death sentence in this case because it "is excessive or disproportionate to the penalty imposed in similar cases." For the reasons expressed in *Clark III*, 1999–NMSC–035, ¶¶ 71, 74–76, 128 N.M. 119, 990 P.2d 793 we reject Defendant's constitutional argument and his argument regarding the universe of cases to be considered in conducting our proportionality review. Our recent opinion in *Clark III*, 1999–NMSC–035, ¶¶ 78–83, 128 N.M. 119, 990 P.2d 793 sufficiently outlines the relevant comparison cases for purposes of our proportionality review under Section 31–20A–4(C)(4). Like the crimes at issue in *Clark III*, 1999–NMSC–035, ¶ 78, 128 N.M. 119, 990 P.2d 793 and the comparison cases cited therein, *see id.* ¶¶ 79–80, Defendant's crime involved a willful and deliberate murder in which a jury found the aggravating circumstances of murder of a witness and murder in the commission of kidnapping. Like the crimes at issue in *Clark III*, 1999–NMSC–035, ¶¶ 81–83, 128 N.M. 119, 990 P.2d 793 the evidence of Defendant's mitigating circumstances is not compelling and his victim was a child. For these reasons, we conclude that Defendant's death sentence is not "excessive or disproportionate to the penalty imposed in similar cases." Section 31–20A–4(C)(4).

{112} In addition to challenging the constitutionality of our proportionality review under the CFSA, Defendant argues that the CFSA is unconstitutional in several other respects. All of Defendant's arguments were addressed in *Clark III*. Therefore we reject Defendant's arguments: (1) that the CFSA fails to give the jury proper guidance about how to weigh aggravating circumstances against mitigating circumstances, *see Clark III*, 1999–NMSC–035, ¶ 66, 128 N.M. 119, 990 P.2d 793 (2) that the CFSA makes effective appellate review impossible because it does not require the jury to make specific findings about mitigating circumstances, *see Clark III*, 1999–NMSC–035, ¶ 67, 128 N.M. 119, 990 P.2d 793 (3) that the term "no significant history of prior criminal activity" in Section 31–20A–6(A) of the CFSA is unconstitutionally vague, *see Clark III*, 1999–NMSC–035, ¶ 68, 128 N.M. 119, 990 P.2d 793 (4) that Section 31–20A–6(H) of the CFSA unconstitutionally penalizes defendants who exercise their constitutional rights to remain silent, obtain the assistance of counsel, and receive a fair trial because it lists a defendant's cooperation with authorities as a mitigating circumstance, *see Clark III*, 1999–NMSC–035, ¶ 69, 128 N.M. 119, 990 P.2d 793 and (5) that the CFSA violates the constitutional prohibitions on cruel and unusual punishment, *see* U.S. Const. amend. VIII; N.M. Const. art. II, § 13 (as amended 1988), because less drastic and equally effective means of deterring people from committing murders are available, *see Clark III*, 1999–NMSC–035, ¶¶ 61–62, 128 N.M. 119, 990 P.2d 793. Thus, none of Defendant's arguments regarding the constitutionality of the CFSA warrant reversal of his death sentence. In the next portion of the opinion, we address Defendant's remaining issues.

## IX.

{113} Defendant contends that this Court cannot perform a meaningful appellate review of his case because the parties' communications with the trial court during certain bench conferences cannot be heard on the audio tapes that were used to record the trial. We do not agree. While it is true that some of the bench conferences may have been inaudible or off the record, the trial court was careful to ensure that its rulings were stated on the record in an audible manner and to provide the parties with an opportunity to record their objections in a similar manner. Further, as in *Clark III*, 1999–NMSC–035, ¶ 56, 128 N.M. 119, 990 P.2d 793 Defendant fails to provide specific references to any inaudible gaps in the record that may prejudice his appeal. *Cf. State v. Martin*, 90 N.M. 524, 527, 565 P.2d 1041, 1044 (Ct.App. 1977) (appellate courts will not search the record to see if an issue was preserved where the defendant did not provide appropriate transcript references), *overruled in part on other grounds by State v. Wilson*, 116 N.M. 793, 796, 867 P.2d 1175, 1178 (1994). There-

fore, this issue does not provide a basis for reversal.

{114} Defendant also contends that his trial counsel rendered ineffective assistance by failing to make timely objections regarding jury selection or the admission of evidence and argument at trial. To prevail on this claim, Defendant "must prove that defense counsel did not exercise the skill of a reasonably competent attorney and that this incompetent representation prejudiced the defendant's case, rendering the trial court's results unreliable." *State v. Lopez*, 1996–NMSC–036, ¶ 25, 122 N.M. 63, 920 P.2d 1017.

{115} On the question whether Defendant's trial counsel exercised the skill of a reasonably competent attorney, the record on appeal shows that counsel objected to the prosecution's evidence and argument frequently and effectively throughout the trial. "Failure to object to every instance of objectionable evidence [or argument] does not render counsel ineffective; rather, failure to object 'falls within the ambit of trial tactics.'" *State v. Martinez*, 1996–NMCA–109, ¶ 26, 122 N.M. 476, 927 P.2d 31 (quoting *State v. Rodriguez*, 107 N.M. 611, 615, 762 P.2d 898, 902 (Ct.App.1988)). "On appeal, this Court will not second guess the trial strategy and tactics of the defense counsel." *Churchman v. Dorsey*, 1996–NMSC–033, ¶ 18, 122 N.M. 11, 919 P.2d 1076; *see also State v. Richardson*, 114 N.M. 725, 729, 845 P.2d 819, 823 (Ct.App.1992) ("[A] prima facie case is not made when a plausible, rational strategy or tactic can explain the conduct of defense counsel."), *quoted with approval in Baca*, 1997–NMSC–059, ¶ 25, 124 N.M. 333, 950 P.2d 776.

{116} Further, inasmuch as we already have concluded that Defendant was not unfairly prejudiced by the selection of the jury, the admission of evidence, or the prosecutor's remarks at issue here, Defendant has not shown the degree of prejudice required for a prima facie case of ineffective assistance of counsel. *Cf. Lopez*, 1996–NMSC–036, ¶¶ 25–26, 122 N.M. 63, 920 P.2d 1017 (concluding that a defendant did not establish that he suffered prejudice when his attorney's failure to object to a jury instruc-

tion did not affect the outcome of the trial). Therefore, we conclude that the record on appeal does not provide a basis for remanding the issue of ineffective assistance to the trial court. *Cf. Martinez*, 1996–NMCA–109, ¶ 25, 122 N.M. 476, 927 P.2d 31 (expressing a "preference for habeas corpus proceedings over remand when the record on appeal does not establish a prima facie case of ineffective assistance of counsel"); *Baca*, 1997–NMSC–059, ¶ 25, 124 N.M. 333, 950 P.2d 776 (similar).

{117} Finally, we address Defendant's claim that he was denied a fair trial. We have noted on several occasions that a fair trial is not necessarily a perfect trial. *See, e.g., Moore*, 94 N.M. at 505, 612 P.2d at 1316. No single instance of error in this trial, nor the cumulative effect of the errors we have identified, justify reversal. The doctrine of cumulative error is not applicable. *See, e.g., Foster*, 1999–NMSC–007, ¶ 59, 126 N.M. 646, 974 P.2d 140.

### X.

{118} There was sufficient evidence to support Defendant's convictions and sentence. The trial court did not err in selecting or instructing the jury or in sentencing Defendant. No other claim of error supports reversal. We therefore affirm Defendant's sentence and his convictions for first degree murder, kidnapping, and attempted CSP.

{119} **IT IS SO ORDERED.**

BACA, SERNA, and MAES, JJ., concur.

FRANCHINI, Justice, (Special Concurrence and Partial Dissent).

{120} I specially concur in the Court's opinion affirming the convictions of the defendant. I dissent from Section II(H) regarding "Victim Impact Evidence."

{121} My concurrence in most of the majority's opinion is special because of my strong personal and philosophical opposition to the death penalty and my strong personal belief that it is based upon a seriously flawed public policy. The reasons I have expressed for my special concurrence in *Clark* are unchanged.

{122} I dissent from the majority opinion on the admissibility of victim impact evidence in Section II(H). It is my opinion that this evidence should not have been admitted during the death penalty phase of this case and that its admission requires a remand to the trial court for a new sentencing hearing.

## I. EX POST FACTO

{123} As the majority acknowledges, this defendant was arrested for his crimes in 1994 before the effective date of New Mexico's victim's right laws. *See* N.M. Const. art. II, § 24(C) (1992) (requiring implementing legislation before Victim's Rights Amendment became effective). A defendant must be given the benefits, as well as suffer the detriments, of the law as it existed and to which he is subject at the time of the offense. The effective date of relevant implementing legislation was January 1, 1995. *See* 1994 N.M.Laws, ch. 144, § 16 (implementing Victims of Crime Act, NMSA 1978, §§ 31–26–1 to –144 (1994, prior to 1997 amendment)). The majority seems to hold that this defendant should be subject to the full punishment provided by the law, as they hold it now exists, rather than by the law that was applicable when he committed the crime.

{124} I strongly disagree. The New Mexico Constitution provides that, "[n]o act of the legislature shall affect the right or remedy of either party, or change the rules of evidence or procedure, in any pending case." N.M. Const. art. IV, § 34 (as amended 1960). In 1995 the legislation that implemented the Victim's Rights Amendment changed the rules of evidence and procedure in the penalty phase of this case while this case was pending. To now affirm the admission of victim impact evidence under Section 31–26–4(G) is a direct violation of Article IV, Section 34, of our Constitution.

{125} Moreover, the admission of victims' statements to the penalty phase of a murder trial operates to the disadvantage of the defendant. This violates our constitutional prohibitions against ex post facto laws. Article II, Section 19, of our Constitution states, "No ex post facto law ... shall be enacted by the legislature." *See also* U.S. Const. art. I, § 10 (same prohibition). The Latin phrase "ex post facto" implicates in its literal meaning any law passed "after the fact." However, courts have recognized "that the constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them." *Collins v. Youngblood*, 497 U.S. 37, 41, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990).

{126} Thus, while Allen's case was pending, the Legislature passed, ex post facto, Section 31–26–4(G), permitting victims to make statements at sentencing. These statutes introduced procedural and evidentiary disadvantages that Allen did not face in 1994 at the time the crime was committed. I strongly believe the application of those statutes to this case violates Article II, Section 19, and Article IV, Section 34, of our Constitution.

## II. TESTIMONY IN A DEATH PENALTY CASE

### A. The Capital Felony Sentencing Act

{127} More important, it is my opinion that victim impact testimony in a death penalty case is not allowed under New Mexico law as it now exists or as it existed in 1994.

{128} NMSA 1978, § 31–20A–2(A) (1979) of the Capital Felony Sentencing Act provides that:

A. Capital sentencing deliberations shall be guided by the following considerations:

(1) whether aggravating circumstances exist as enumerated in Section 6 [31–20A–5 NMSA 1978] of this act; and

(2) whether mitigating circumstances exist as enumerated in Section 7 [31–201A–6 NMSA 1978] of this act; and

(3) whether other mitigating circumstances exist.

{129} The Act enumerates specific factors that are mitigating, and then expressly states that the enumerated list is not exclusive. It also enumerates specific factors that are aggravating and, unlike the list of mitigating circumstances, that list is exclusive.

{130} The Act is careful to cabin the jury's analysis of these factors:

After weighing the aggravating circumstances and the mitigating circumstances,

weighing them against each other, and considering both the defendant and the crime, the jury or judge shall determine whether the defendant should be sentenced to death or life imprisonment.

Section 31–20A–2(B).

{131} The Act does not require that the jury weigh the aggravating and mitigating circumstances in the abstract; it directs the jury to perform the weighing in the context of both the defendant and the crime. It does not, however, allow the jury to pick additional features of the crime, or facts about the defendant, and weigh them in the balance as additional aggravating factors. Of course, to the extent that the crime or the defendant may present mitigating features, they would be free to weigh those in the balance. The State argues to the contrary when it says that "the defendant's character and past criminal history are highly relevant and important evidence" in a capital sentencing hearing. However true this might be, if this Court were writing on a blank slate, it is *clearly not* what the Legislature envisioned when it crafted the Capital Felony Sentencing Act.

{132} The Act enumerates that "the defendant has no significant history of prior criminal activity" as a mitigating circumstance. NMSA 1978, § 31–20A–6(A) (1979). Conspicuously, however, a "significant" history of prior criminal history is not an aggravating circumstance. *See* NMSA 1978, § 31–10A–5 (1981) (setting out aggravating circumstances). This creates an asymmetry which the State seeks to redress by claiming that prior crimes of the defendant are "relevant" to the jury's sentencing decision, and that they are admissible in light of the requirement in Section 31–20A–2(B) to consider "both the defendant and the crime."

{133} The problem with the State's argument is that while a legislature might determine that a defendant's prior criminal history is a proper reason, in some circumstances at least, to impose the death penalty, in New Mexico our Legislature has not done so. In contrast, the California Penal Code states, "In the proceedings on the question of [capital] penalty, evidence may be presented . . . as to . . . any prior felony conviction or con-

victions whether or not such conviction or convictions involved a crime of violence, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence. . . ." Cal.Penal Code § 190.3 (West 1999).

{134} It should be noted that even though the Legislature has had several opportunities to amend the Capital Felony Sentencing Act after our Victim's Rights Amendment was passed and put into effect in January of 1995, it has not done so. The conclusion I reach, therefore, is that the Victim's Rights Amendment and Act apply to traditional sentencing proceedings, but not death penalty proceedings. The sentence of death is substantially different in that it is final, requiring a specifically tailored scheme. I note that the United States Supreme Court in *Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), by a 5–4 vote, held that victim impact evidence is not *per se* barred by the Eighth Amendment to the United States Constitution. I note also that our statute was written before *Payne*. Therefore, it is reasonable to assume that our Legislature intended the rule that victim impact evidence is not admissible in death penalty cases in New Mexico. *See Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers*, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), both overruled by *Payne*, 501 U.S. at 808–09, 111 S.Ct. 2597. The Legislature made no change in our statute after *Payne* although it has had many opportunities to do so. Other courts have held that their state death penalty statute, passed during *Booth* and before *Payne*, could not have intended to include victim impact evidence as part of a death penalty proceeding. *See, e.g., State v. Metz*, 131 Or.App. 706, 887 P.2d 795, 801 (1994) (when Oregon's death penalty statute was enacted, *Booth* was the law, consequently the legislature could not have envisioned or intended Oregon's death penalty scheme to permit victim impact evidence); *accord Smith v. State*, 919 S.W.2d 96, 102 (Tex.Crim.App.1996), *overruled by Mosley v. State*, 983 S.W.2d 249, 261–62 (Tex.Crim.App. 1998) (relying upon *Payne* ).

{135} The Legislature's complete failure to mention victim impact evidence in the Capital Felony Sentencing Act is understandable. That kind of evidence is, as this case demonstrates, highly passionate and emotional. The Legislature has specifically instructed this Court to hold a death sentence invalid if "the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." NMSA 1978, § 31–20A–4(C)(3) (1979). Indeed, the whole point of death penalty sentencing is to objectively channel the jury's determination of who shall live and who shall die. *Zant v. Stephens*, 462 U.S. 862, 876–77, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *State v. Clark*, 108 N.M. 288, 308, 772 P.2d 322, 342 (1989), *sentence vacated on other grounds by Clark v. Tansy*, 118 N.M. 486, 495, 882 P.2d 527, 536 (1994). Every care must be taken so that objective, meaningful distinctions are drawn between who lives and who dies. Passion does not meaningfully distinguish between cases.

{136} The State recognizes the power of victim impact evidence. That is precisely why it fights so hard to introduce it. It is unquestionably powerful emotional evidence that appeals to the sympathies or emotions of the jurors. But the "[e]vidence that serves no purpose other than to appeal to the sympathies or emotions of the jurors has never been considered admissible." *Payne*, 501 U.S. at 856–57, 111 S.Ct. 2597 (Stevens, J., dissenting). If our Legislature even considered the admission of victim impact evidence—a highly unlikely possibility because *Booth* prohibited such evidence at that time—then it is difficult to imagine what the Legislature intended to exclude by invalidating a death sentence imposed under the influence of passion, prejudice, or other arbitrary factor.

**B. The purpose of the Capital Felony Sentencing Act is to objectively channel the jury's determination, not to open death penalty determinations to an emotional free-for-all**

{137} Death penalty sentencing statutes that do not meaningfully and objectively channel the jury's determination are unconstitutional. *Zant*, 462 U.S. at 875, 103 S.Ct.

2733; *State v. Henderson*, 109 N.M. 655, 663, 789 P.2d 603, 611 (1990) (because death is the ultimate penalty, jury discretion must be suitably directed and channeled, so that the risk of arbitrary and capricious actions is minimized), *overruled on other grounds by Clark v. Tansy*, 118 N.M. at 493, 882 P.2d at 534. When death is a potential penalty, we require the greatest possible precision in the process. "The penalty of death is qualitatively different from any other sentence," and consequently the procedures must demonstrate "a greater degree of reliability when the death sentence is imposed." *Lockett v. Ohio*, 438 U.S. 586, 603, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *see also Henderson*, 109 N.M. at 659, 789 P.2d at 607. Death penalty sentencing procedures cannot allow "a substantial risk that the [death penalty will] be inflicted in an arbitrary and capricious manner." *Lockett*, 438 U.S. at 601, 98 S.Ct. 2954 (quoting *Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). It "is of vital importance ... that any decision to impose the death sentence be, and appears to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 357–58, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977).

{138} When highly emotional evidence from bereaved family members is introduced, there is a danger that verdicts become arbitrary and improperly based on passion. A number of state courts have recognized that their statutes do not authorize the admission of victim impact evidence, or that such evidence is not relevant, and should not be a part of rational scheme to channel a jury's sentencing decision. *See generally State v. Atwood*, 171 Ariz. 576, 832 P.2d 593 (1992); *State v. Carter*, 888 P.2d 629 (Utah 1995); *Smith*, 919 S.W.2d 96; *Mack v. State*, 650 So.2d 1289, 1324–25 (Miss.1994); *Bivins v. State*, 642 N.E.2d 928 (Ind.1994).

{139} These cases are consistent with the *Payne* majority's holding that the question of whether to admit victim impact evidence is for states to decide. *Payne* does not hold that states must admit such evidence. "We do not hold today that victim impact evidence must be admitted, or even that it should be admitted. We hold merely that if a State decides to permit consideration of this evi-

dence, 'the Eighth Amendment erects no per se bar.' " *Payne,* 501 U.S. at 831, 111 S.Ct. 2597 (O'Connor, J., concurring) (quoting majority opinion).

### C. Prejudice in this Case

{140} In my view, and contrary to the majority opinion, the victim impact evidence in this case was excessive and warrants a new sentencing hearing even under the *Payne* standard. Portions of the victim impact testimony, which, in my opinion, far exceeded the limited testimony tolerable under *Payne,* follow:

{141} A friend of the Phillips family, Laci Minor, described the family's efforts to find the missing girl. She related that Darlene Phillips called her the evening that her daughter disappeared, and that, after a sleepless night, she helped Ms. Phillips talk to the police the next day. She described putting up posters as far away as Flagstaff, Prescott, Holbrook, and Phoenix. The prosecutor asked her:

Q: Okay, and how were those—those six weeks of waiting?

A: They were horrible. We—it was just horrible not knowing if she was okay or where she was. Every time the phone rang, we jumped. We—we hoped that she would call or that somebody would call. Darlene tried to follow every lead that she possibly could. She—she talked to people every day. If she had to call them, if she had to go out on the street and would walk around and just talk to people, and carry a picture around and say, "Have you seen this girl?" At one point her and Billy went to Colorado and talked to a psychic. We—we—we lived every day. We got up every day and we went to work. We slept. But it wasn't a life, for six weeks.

{142} The State ended by eliciting, in considerable detail, Darlene Phillip's reaction to the news of her daughter's death. Ms. Minor received an emergency phone call at work, telling her to meet the Sheriff at the Phillips' house in 15 minutes. Deputy Cheverie told her, "Now, you have to go in and tell Darlene."

Q: You were standing with [Deputy] Jim Cheverie outside the house?

A: Yes, sir. And I started walking to the house, and I got about halfway there and I just stopped and I—I said, I can't. I'm—cannot go in and tell her that her daughter is dead. I cannot do that. So he said he would do it. We went into the house. Darlene had an appointment with Mr. Cheverie at the time, so she didn't think it was strange that he was there, and she thought that I was there for support because she—because she was going to talk to him and I could have my input. So it wasn't strange to her that we showed up. We walked in, and she greeted us—her and Bill greeted us, and—and we are smiling and—and instantly she kind of looked at me, and she said "What? What is wrong?" And so Mr. Cheverie told her that they had found Sandra's body.

Q: How did Darlene react?

A: Probably like any mother would react whenever somebody tells them that their daughter's body has been found. She—

Q: What did she do to Deputy Cheverie?

A: She started hitting him in the chest, and she started asking him why and who and then she went outside. Darlene ran outside.

Q: Did you follow her?

A: Yes, sir, I did. My sister stayed in the house with Bill, and Mr. Cheverie and I went outside with Darlene. And she was—she was running around the driveway, and she was crying. And I would try to—I would try to hug her and touch her, and she would tell me no. And she was yelling and screaming, and the neighbors started coming out of their houses. And I finally got her to go back inside. And she went into the house and she picked up the cordless phone, and handed it to me. And she said, "Now, you have to call Steven [Sandra Phillip's brother] and tell him that his sister is dead." So I took the phone outside and I called Steve, and I'm sure that he knew something was wrong instantly when he picked up the phone, because I said, "Steve, this is Laci Minor." And he said, "What's wrong?" And I said, "I think you'd better get a plane ticket and get here because Sandy's been found and

she's dead. And we need you." And I hung up the phone with him and I just started—I called Darlene's best friend, Carol Williams, and I asked her to please come as soon as she could because we needed her. I called my parents. I called as many people as I could think of just so that they could help me take care of Darlene and Bill. And then I—we started calling the relatives in Phoenix, and we started—I started making travel arrangements so we could get everybody here. And my sister and I went and got beds and pillows and blankets. My parents and the Williams they went to Sam's Club and bought food for everybody who was coming. We—the community instantly started bringing things—blankets, beds, tables, food. And later that night I went to the airport and picked up Steve and his grandma and grandpa and his aunt, who had flown in from Phoenix. And I took them home. And instantly Steve got out of the car before I even had the car stopped. He was jumping out and he just—he ran in the house, and he grabbed his mom. And we had a—an entire week like that.

Q: How has it been, since the funeral, for Steve?

A: Steve is not a man of open emotions. He's certainly not going to sit around and tell people how he feels or what he's gone through since this has happened to him because no matter what has happened to him, and no matter what he feels, it can't compare to what—what his sister went through on February 7th.

Q: Steve feels like he's responsible in any way?

A: He feels extremely guilty. The guilt that he feels has almost destroyed him because he's the one who went to the restaurant and picked up his sister. He was going to bring her home to his mom. And he feels like if he would have never picked her up, she would still be in Phoenix and she'd still be alive. And he feels anger that anybody could possibly do this to his baby sister. Not only did he take away a sister and daughter. He took away grandbabies that Sandy would have given Darlene. He took away an aunt to my children and—and cousins. And I also feel like he took away a very wonderful person who would have been a care giver to our community, who would have given back. She would have been a nurse, she would have been a good nurse, and she would have been taking care of people.

Q: How has Darlene been since the time—since the funeral?

A: Darlene is on a constant roller coaster of emotions. Darlene's a care giver and she has been for a long time and she is unable, for the first time in her whole life, to care for somebody, who's herself. Every day she goes to the hospital and she takes care of people who are dying, but she's dying inside and she can't take care of herself. Every day people talk about the cures for diseases that they're trying to find, well I wonder what about the cure for our hearts and our souls and our—the holes that have been put there, and the loss that we suffer. What about a cure for that? How is Darlene supposed to take care of herself now? And take care of other people. She—she kept Darlene's—excuse me, she kept Sandy's room exactly how she left it, for the longest time, because she would tell me, Sandy's going to come home and I want her room to be just like she left it when she comes home.

Q: Is that after the funeral?

A: Yes, sir.

Q: How long did she—did she keep Sandy's room the way it was?

A: I would say until late summer of this year.

STATE: I have nothing further, Your Honor.

{143} Ms. Minor had also described her friendship with Sandra Phillips, based on their mutual love of cheerleading and animals. She described Sandy's love of her pet iguana. She described Sandy's plan for the future:

[S]he discussed with me how she also wanted to be like her mom, and she wanted to be a nurse. So we got really excited because we had this whole plan worked out where we could go to nursing school together and we could take the classes to-

gether and we could study together. I mean, it sounds kind of silly, but we were being girls and discussing how neat it would be to hang out together.

{144} In his rebuttal closing at the penalty phase, the prosecutor ended his (rather short) argument with:

> This is the stuff that leaves parents in fear for our children and tell them, "Don't take rides from strangers; don't accept candy from strangers." The story of Sandra Phillips is the stuff that we can tell our children or our grandchildren because it is the agony and the horror of every parent.

He talked about Darlene's anguish:

> You saw Darlene as she watched that video, and you must have been watching her facial expressions. And you heard her, when she first testified she … It was just natural. She stared off into space. God, I miss her. You heard from Laurie—Laci, I'm sorry, what they suffered, and the horror. Darlene going on, beating on Jim Cheverie's chest; then running around the yard until the neighbors came out. The grieving process is natural to any tragedy especially when young people are involved. Society, I submit to you, has the right to grieve also. I don't expect of you, nor should I ask of you, to feel what Sandra Phillips felt before she died, that terror; or what the Phillips family suffered after her death. But society has a right to grieve. It has a right to mourn. And it has a right to grieve and mourn by its verdict in this particular case. You have the right to express your indignation of this awful act by your verdict. There's nothing wrong with the carefully considered expression of community outrage. Indeed, community/society outrage in this case is so, so appropriate. Because that precious thing you saw in that video and that light in her eye can never be replaced. No, but a verdict of death will replace that. Nothing will bring Sandra back; but there is still justice, a verdict of guilty.

{145} Just reading the emotional testimony of Laci Minor is painful. The effect on the jury, who was present in the room when she spoke, is incalculable. The jury was not just a passive observer, it was being asked to do something about the family's pain: to return a death verdict. In my view, by the terms of the New Mexico Capital Sentencing Act, this inflammatory and emotionally compelling testimony was not admissible. *See* N.M. Const. art. II, §§ 13, 14, 18; U.S. Const. amends. V, VIII, XIV.

{146} The State's victim impact evidence was more than a passing glimpse of the victim's life and the sorrow of survivor. A "dramatic appeal to gut emotion has no place in the courtroom." *Hance v. Zant*, 696 F.2d 940, 952 (11th Cir.1983), *overruled on other grounds by Brooks v. Kemp*, 762 F.2d 1383, 1399 (11th Cir.1985). In my opinion, for the reasons set out above, the State's presentment of victim impact evidence requires a new sentencing hearing free of unnecessary passion certain to provoke unfair prejudice.

{147} The majority holding otherwise, I respectfully dissent from Section II(H) of the majority opinion.